The **PROTECTIVE NATIONAL INSURANCE COMPANY OF OMAHA**, a Nebraska corporation, Plaintiff,

v.

**COMMONWEALTH INSURANCE COMPANY**, a Canadian corporation, Defendant.

No. CV 86-0-446.

United States District Court, D. Nebraska.

March 16, 1989.

James P. Fitzgerald, McGrath, North Law Firm, Omaha, Neb., for plaintiff Protective Nat.

Jeffrey S. Facter, Orrick & Herrington, San Francisco, Cal., for defendant Commonwealth Ins.

RICHARD G. KOPF, United States Magistrate.

The Protective National Insurance Company of Omaha (Protective) pursuant to Federal Rule of Civil Procedure 37, moves the court for an order requiring the Commonwealth Insurance Company (Commonwealth) and its Federal Rule of Civil Procedure 30(b)(6) spokesperson, Elizabeth Murphy (Murphy) to:

1. Answer questions concerning the factual basis of Commonwealth's allegations in its answer and counterclaim;

2. Answer questions which Murphy refused to answer during the deposition; and

3. Produce all documents which form the basis of or relate to the facts upon which Commonwealth bases its allegations that Global was negligent in managing the insurance business and that Protective was negligent in supervising Global.

Protective further moves the court for an award of reasonable costs and expenses incurred in the preparation of the motion and for expenses incurred in retaking the Murphy deposition. (Filing 109).

Oral argument was heard, by telephone, on March 9, 1989. I will grant the motion (filing 109) in part and deny it in part.

## I.

Protective sued Commonwealth, claiming that Commonwealth owed Protective monies arising out of Commonwealth's reinsurance of certain risks originally written by Protective's agent, Global. Commonwealth answered and submitted a counterclaim essentially alleging that Commonwealth would not have become a participant in the reinsurance had it known of the mishandling of claims by Global. Protective than began to engage in discovery.

In order, presumably, to tie Commonwealth down, Protective served various notices to take depositions and demand upon Commonwealth that it designate a spokesperson pursuant to Federal Rule of Civil Procedure 30(b)(6). After a protracted period of time, Protective, faced with the unwillingness of Commonwealth to designate a 30(b)(6) spokesperson, filed a motion for order compelling discovery (filing 65) in which, among other things, Protective asked the court to compel Commonwealth to designate and produce one or more of its officers to testify on behalf of Commonwealth at a deposition. Commonwealth had apparently taken the position that it would refuse to designate a 30(b)(6) spokesperson because the allegations contained in the answer and counterclaim and the information concerning the answer and counterclaim were derived from an ongoing investigation conducted by Commonwealth's attorneys and not from an officer, director or managing agent of Commonwealth or any other person subject to designation under Rule 30(b)(6). Letter from Carl Chamberlain to James P. Fitzgerald (November 6, 1987), *quoted in part* in Filing 65, Exhibit C. The parties were able to overcome their differences, and amended notices to take depositions were filed (filings 69 and 70).

Thereafter another dispute arose as to the scheduling of the Murphy deposition. Protective filed a motion to compel, once again requesting that the court compel Murphy's attendance at the deposition which had been previously agreed upon by counsel (filing 81). I heard argument on the motion and compelled Murphy to attend the deposition, but denied sanctions, fees, and costs because Protective had not reduced to writing a stipulation that the deposition would take place in San Francisco, California, the place of residence of Commonwealth's lawyers, not the Canadian

province in which Murphy resided (filing 84). The deposition then took place as I ordered.

Murphy was a thirty-year old chartered accountant who had been employed by Commonwealth for four years at the time of the taking of her deposition in October of 1988 (Filing 109 (Deposition of Commonwealth Insurance Company under Rule 30(b)(6) [hereinafter Deposition])). Murphy testified that she was the designated representative of Commonwealth (Deposition 4:12–14). At the time of the taking of her deposition, Murphy was an assistant vice president of finance for Commonwealth who had the responsibility for handling the completion of the reinsurance book of business, including the so-called Global program, which had been assumed for Commonwealth by an agent of Commonwealth (Deposition 7:5–8:23). Murphy had never had her deposition taken before (Deposition 3:17–18).

Thirteen pages into the deposition, counsel for Protective asked Murphy whether she had reviewed the pleadings in the case, and Murphy replied that she had not (Deposition 13:23–24). Counsel for Protective and Commonwealth and Murphy then engaged in the following colloquy:

Mr. Facter: Well, hold on a second. The trouble is when you use lawyer's words the witness may not understand what you're talking about. I'll represent that Ms. Murphy took a look at the counterclaim that we had filed, and I assume that's embraced in what you mean by pleading. And she also took a look at some interrogatory responses.

I don't know whether that's embraced or not in what you mean by pleadings. And I also assume she's excluding from her answer things that she's seen over the past couple years before you served Exhibit 1 on Commonwealth's attorneys, which obviously are part of her background in being a designee of Commonwealth. So let me object to the ambiguity of the question.

Mr. Fitzgerald: Q. Well, let me just— I'll just clarify that.

You looked at Commonwealth's answer and counterclaim and you looked at Commonwealth's answers to interrogatories and you looked at the notice.

Did you look at anything else to get ready for this deposition:

A. I looked at the notice today.

Q. Okay. Did you do anything else to get ready for the deposition?

Mr. Facter: Same objection. It's the "get ready" part that we're having trouble with. She's obviously reviewed many documents related to this matter over the course of time. All of that is part of her readiness. If you're asking whether in the last few hours she's studied things, that's a different question.

Mr. Fitzgerald: Q. Have you looked at some of the documents that either Protective National or Global or Intere have provided as part of this lawsuit?

A. When?

Q. At any time before this deposition.

A. I guess I don't understand. Do you mean in the last couple of years?

Q. Yes.

A. Yes, in the last couple of years I've looked at some.

Q. You didn't look at any of that stuff specifically to get ready for this deposition within the last, I don't know, week or whatever. Is that a fair statement?

A. Yes.

Mr. Facter: There hasn't been much time to do anything but travel in the last week for either of us.

Mr. Fitzgerald: Okay.

(Pause.)

Q. Is there anybody at Commonwealth who is better qualified or more suitable to testify regarding the subjects that we have listed on page 2 of the notice to take deposition?

(Pause.)

A. At this time, no.

(Deposition 13:25–16:2).

Then counsel for Protective endeavored to find out whether or not Commonwealth had complied with the notice to produce documents at the deposition:

Q. On page 3 the notice requests you to bring whatever documents that you had in your possession or under your control that related to those above subjects.

Did you bring any records with you today?

A. No.

Q. Why not?

Mr. Facter: Let me just comment that I don't know whether you're asking for the advice Ms. Murphy was given by counsel, but it's counsel's view that, to our knowledge, whatever documents fall within this category have already been produced in connection with our response to the document demands that we've received in this case or identified in connection with the 2 sets of interrogatories that have been served in this case. We don't know of anything outside that universe.

Mr. Fitzgerald: When you say that, do you mean there have been some documents that have been identified, but not produced?

Mr. Facter: I don't know. I'd have to look back at the interrogatories.

Mr. Fitzgerald: Okay. I just want to be sure that we have seen all written documents, notes, memorandum, correspondence, et cetera, that relate to the subjects of paragraph 1–A, B, and C of our notice.

Mr. Facter: And I don't know whether you have or not, but what I do know is that with respect to any document that would be called for by this notice, it was also called for by either your document demand or your interrogatories and that our responses to those requests contain our responses, whatever they are.

Mr. Fitzgerald: Well, Jeff, I don't want to play word games. I just want to know if there is anything out there that is covered by this deposition notice that we haven't already seen.

Mr. Facter: And I'm not playing word games, but the answer is that we don't know, and the reason for that is that I don't have a photographic memory as to what documents we might have asserted

a privilege over, but if you look back at our document—our response to your document request to the interrogatories that were served on us by both Protective National, Global and Intere, you have the sum total of our responses to this notice which is encompassed in the early document request that we received.

In other words, what I'm saying is there is nothing new in this document request that we haven't responded to at some prior time.

Mr. Fitzgerald: Okay.

(Deposition 16:3–17:24).

It soon became clear that what Murphy knew about the case in terms of facts arose out of communications she had received from Commonwealth's lawyers. The deposition really began to unravel.

Counsel for Protective wanted to determine what factual basis existed for specific paragraphs in the answer and counterclaim. Three exchanges will be recited herein to give a flavor for what occurred during the deposition. Suffice it to say that Murphy was not allowed by Commonwealth's counsel to give the facts of which she may have been aware that were communicated to Commonwealth by Commonwealth's attorneys.

The first example has to do with Commonwealth's claim that Global did not have in place the means to handle the insurance business that it was underwriting. Protective's lawyer wanted to know the factual basis for that allegation:

Q. Now, turn to page 9, paragraph 27. I believe before we started all this that you said you had read that?

A. M-hm, yes.

Q. There's a statement in there that says, Global did not have in place an apparatus that could handle the insurance business that it was underwriting.

Do you see that?

A. Yes.

Q. What's the factual basis for that allegation?

Mr. Facter: Let me just ask for a clarification. When this complaint was prepared, counsel furnished to Common-

wealth its opinions concerning what legal claims Commonwealth had and the basis for which counsel believed that legal claims existed and counsel's evaluation as to the strength of those claims.

I take it that your question to Ms. Murphy excludes the report from counsel concerning their legal opinion of the claims and the basis for that legal opinion, am I right?

Mr. Fitzgerald: No. My question was, what is the factual basis for the allegation in paragraph 27. I want to know facts.

Mr. Facter: I understand that, but what I'm asking you, Mr. Fitzgerald, is, is the witness to exclude from her answer the basis· that was part of the report of the legal opinions provided to her by counsel prior to the decision to file this counterclaim?

Mr. Fitzgerald: My question related to the facts. My question is pretty simple and if you're not going to answer it, tell me so. If you're objecting to it, tell me so, but the question is what is the factual basis for that claim that Global did not have an apparatus that could handle insurance business that it was underwriting.

Mr. Facter: Well, I'm asking you for some clarification before I decide whether I'm going to object to the question. And the clarification I've asked for is, does your question include, do you want Ms. Murphy to report to her the conversations that she had with me concerning the legal opinions that form the basis for this counterclaim and the factual basis that were included in that legal opinion evaluating those claims?

Do you want her to repeat those conversations to you? If you don't want her to and you want to exclude that material from your question, fine, we can move on. I want to know whether that is embraced by your question.

Mr. Fitzgerald: Q. The question is pretty clear. I'm not asking you to relate the opinion that your counsel gave you. I am asking you for the facts that support this allegation.

Mr. Facter: Let me try one more time. When we give an opinion, we provide the basis for that opinion, that is, what we've discovered in our investigation and what legal consequences we believe our discoveries have. Are you asking her to repeat to you the conversations that she'd had with me concerning our legal opinions and the factual basis for those opinions that were acquired during our investigation?

Mr. Fitzgerald: I think the question is perfectly clear. If you've got an objection, state it. Otherwise, please answer the question.

Mr. Facter: Why don't you answer my question yes or no? I don't want to start filling the record with objections if there is no reason for me to be objecting. I'm asking for, I think, a reasonable clarification.

Mr. Fitzgerald: I've asked the question. Either object to it, instruct her not to answer, or object to it, or let her answer.

Mr. Facter: Why don't you answer my question?

Mr. Fitzgerald: Q. Are you going to answer the question, Ms. Murphy?

Mr. Facter: Excuse me. Aren't I entitled to a clarification of the question?

Mr. Fitzgerald: Q. I've explained it about as much as I can. I want the factual basis. I'm not asking for your lawyer's opinions.

Mr. Facter: Does it include the factual basis provided by the lawyers in connection with the legal opinion that they gave?

Mr. Fitzgerald: I want to know what Commonwealth relies on, what facts Commonwealth relies on to make that allegation.

Mr. Facter: Well, until we have some clarification, I don't see how the witness can answer your question. We can't tell whether you're asking for privileged information or not.

Mr. Fitzgerald: Okay, let's move on to paragraph 28, then—strike that.

Let's go back to paragraph 27. Who has got knowledge of the factual basis of paragraph 27, what individuals do?

Mr. Facter: By knowledge, do you mean reported knowledge?

Mr. Fitzgerald: What do you mean by reported knowledge?

Mr. Facter: Well, are you asking who at Commonwealth knows these facts firsthand or are you asking who at Commonwealth had these facts reported to them by another person?

Mr. Fitzgerald: I'm asking who at Commonwealth knows about them in any sense of the word.

Mr. Facter: Okay, including reports, then.

The Witness: I have knowledge of those facts as reported to me by our lawyers.

(Deposition 30:18–34:18).

Counsel for Protective then endeavored to find out what the factual basis was for Commonwealth's claim that efforts to bill and recover deductibles and salvage were highly sporadic, resulting in enormous costs to the reinsured. Protective was no more successful in this inquiry then it had been in the previous inquiry, to-wit:

Q. What's the factual basis for that statement that efforts to bill and recover deductibles and salvage were highly sporadic, resulting in enormous costs to the reinsurers?

(Pause.)

A. My knowledge for that is information that was reported to me by counsel.

Q. What facts were reported to you by counsel as distinguished from opinions?

Mr. Facter: Again, I'll try to do it in terms of clarification. If there were facts that were reported to the witness that weren't a part of a report evaluating legal claims, then you can ask about those facts.

But if your question is meant to embrace facts that were provided to Commonwealth as part of an opinion and an evaluation of the strength and weaknesses of Commonwealth's claims, then I

would assert a privilege. So I wonder if you could clarify the question.

Mr. Fitzgerald: Q. Well, let me start out by asking you, what facts do you rely on that are separate and apart from the information—from the opinion and evaluation that you received from counsel?

A. None.

Q. You have no other facts other than what came through counsel?

A. None.

Q. What facts were reported to you by counsel?

Mr. Facter: I guess I object to that question in that I understand it to call for a repetition of conversations which contain attorney-client privileged material including the bases for the legal opinions that we provided.

Mr. Fitzgerald: Just so my question is clear, Ms. Murphy, I'm not asking you for your lawyer's opinion or evaluation. I just want to know what facts support your allegation behind paragraph 28(A).

Mr. Facter: The difficulty is in asking the witness to separate out those things, in other words, what she got was a report that said we believe you have the following legal claims based on the following, and the 2 were intrinsically linked. If she has facts apart from those conversations, fine, I have no objection to that, but I think she testified she didn't with respect to 28(A).

Mr. Fitzgerald: Are you instructing her not to answer?

Mr. Facter: If I understand the question correctly as calling for the factual basis for the legal opinion that was provided by counsel then, yes, I am.

Mr. Fitzgerald: Are you instructing her not to answer?

Mr. Facter: Yes.

Mr. Fitzgerald: Q. Ms. Murphy, are you following your counsel's advice and refusing to answer?

A. Yes.

(Deposition 38:13–40:15).

Protective once again endeavored to find out what the factual basis was for Commonwealth's claim that deductibles and sal-

vage had not been recovered and had not been properly credited to the reinsurers, and once again Protective was not successful. The following exchange took place:

Mr. Fitzgerald: Q. In paragraph 28(B) there is an allegation that deductibles and salvage had been recovered and had not been properly credited to the reinsurers.

Do you see that?

A. Yes.

Q. What's the factual basis for that allegation?

A. The factual basis of the allegation is as reported to us by our counsel.

Q. And the facts were contained in that report?

A. Yes.

Q. And are you taking the position that you don't have to disclose those facts?

Mr. Facter: That's a position I was taking to the extent that the facts are part and parcel of an evaluation of the strength and weaknesses of claims. If the facts were relayed separately to Ms. Murphy, then we might have a different situation.

Mr. Fitzgerald: Q. The facts were not relayed to you separately, is that correct?

A. Right, no facts were relayed to me separately.

(Deposition 55:18–56:12).

Protective also had tried to determine how Commonwealth was damaged by the actions described in the answer and counterclaim and once again was frustrated. The exchange read like this:

Mr. Fitzgerald: Q. Now, how does Commonwealth contend that it was damaged by not following the minimal claims handling practices?

A. At what point in time?

Q. At any time.

A. If proper claims handling procedures had been followed, then the initial information which we were given in 1982 would have, in all likelihood, shown a higher loss ratio, in which case Commonwealth would have been given informa-tion than what they were given when they signed on [sic]. If there had been proper claims handling in the event that Commonwealth had still signed on, then the claims which we were being asked to pay now would be less.

Q. How do you know that?

A. I know just based upon my experience that with poor claims handling claims, costs had escalated. I also have knowledge specifically relating to this case based upon the information provided to us by our counsel.

Q. I'm sorry, I didn't understand that answer. What do you mean by- that?

A. I can't remember what question you asked me to answer right now.

Q. I'm asking what you mean by your answer.

Mr. Facter: Could we have the answer back.

(Record read:

"A. I know just based upon my experience that with poor claims handling claims, costs had escalated. I also have knowledge specifically relating to this case based upon the information provided to us by our counsel.")

The Witness: What was the question I was answering?

Mr. Facter: That's what I thought.

(Record read:

"Q. How do you know that?")

Mr. Facter: From our side of the table, neither of us seems to understand what you didn't understand about the last answer. Maybe if you could direct her to what you don't understand, she can answer.

Mr. Fitzgerald: Q. You said that you had some knowledge in this particular case about how the failure to follow proper claims handling practices had damaged Commonwealth. Is that a fair statement, a fair summary of your answer?

A. I don't think I said I had knowledge. You asked me how Commonwealth had been damaged.

Mr. Fitzgerald: Would you read that last sentence of her prior answer?

(Record read:

"A: I also have knowledge specifically relating to this case based upon the informatin [sic] provided to us by our counsel.")

The Witness: I don't believe that answer was in answer to what you've just asked me now.

Mr. Fitzgerald: Q. Ms. Murphy, I'll sit here and play word games with you all day and all day tomorrow and all day Sunday if that's what you want to do.

Mr. Facter: Object to that. Just ask questions, don't give lectures.

Mr. Fitzgerald: Look who's talking.

Mr. Facter: Ask an understandable question and she'll give you an understandable answer.

Mr. Fitzgerald: Q. Ms. Murphy, do you know how Commonwealth has been damaged in this case by Global's alleged failure to follow minimal claims handling practices?

Mr. Facter: Asked and answered. She's already answered that.

Mr. Fitzgerald: Are you instructing her not to answer?

Mr. Facter: Yes.

(Deposition 60:23–63:17).

At other times during the deposition Ms. Murphy would say that the only facts she was aware of which supported the allegations contained in the answer and counterclaim were facts which had been reported to her by Commonwealth's counsel and that she did not remember any of the specific facts. For example, Ms. Murphy testified as follows:

Mr. Fitzgerald: Q. What is the factual basis for the contention in paragraph (E)?

(Pause.)

A. What factual basis did Commonwealth have for making that claim?

Q. Yes, Ma'am.

(Pause.)

A. The information and advice given to us by our counsel.

Q. What facts are those?

A. I don't remember any specific facts.

(Deposition 75:5–15).

Shortly before counsel broke for lunch, counsel for Protective indicated to Ms. Murphy that there were questions that Ms. Murphy had not answered, and accordingly, the deposition would be adjourned to allow Protective to seek a court order (Deposition 89:2–6). After the noon lunch break, counsel for Commonwealth suggested that the parties engage in telephone consultations with the court in order to resolve the difficulties. Both Protective's counsel and counsel for another litigant indicated that it would be difficult to articulate for the court the issues which had arisen absent a transcript. The colloquy between counsel went like this:

Mr. Facter: Mr. Fitzgerald commented before we broke for lunch that he had planned to make an application to compel further testimony from Ms. Murphy because he was dissatisfied with some of the answers that he received this morning, and I am somewhat concerned that the costs of each of the parties not be raised unnecessarily.

I recall only 1 or 2 instances this morning where I instructed the witness not to answer on the grounds of privilege. If those are the questions that caused Mr. Fitzgerald a problem, although I believe he ultimately got the answers he wanted even to those questions, then I think we ought to get the court on the phone right now so we needn't troop back here just because of a couple of questions she was instructed on.

Let me say to the extent there was dissatisfaction with the answers this morning, what I perceived was that Ms. Murphy did answer the questions, but did not have a lot of specific examples that back up allegations in the complaint and I think she made clear that the reason for that was that she left the gathering of the specific examples to the attorneys and then instead she got a report that in effect stated the conclusions.

That result I think is not a function of any instructions to the witness not to

answer or any type of evasiveness, but just a function of the fact that the first audit that was done was a very preliminary overview survey type of audit and this witness doesn't have specific examples and also part of the function of the fact that it is through the discovery process that we intend to get the specifics to fill out the picture that was given to us by the initial survey.

In any event, if you want to make an application to the court with respect to questions that the witness was instructed not to answer, let's do that now so that we don't all disperse and have the additional costs of getting back together again. There aren't that many questions.

Mr. Brown: Let me say, in my judgment, I don't think it's possible to lay the issue out correctly for a court to decide via telephone in the middle of the afternoon on Friday. Counsel won't be able to articulate the issues accurately, so as far as I'm concerned, that's not a practical suggestion.

Mr. Fitzgerald: As far as I'm concerned, I think we need a transcript so that the court can get the flavor of the witness's response and your coaching of the witness and of your limitations to the questions.

And, as I recall, there were a lot of questions in which you instructed Ms. Murphy not to answer, so I just—I'm probably more interested in keeping the costs down than you are because we've had to come out to San Francisco here and my client, Protective National, is in—under supervision, so it doesn't have a lot of money to spend on lawyers.

Given your coaching of the witness and your instructing of her not to answer, we need—we'll need a transcript and I think that's what I'll suggest to the court, but it is my intention to move and that she be required to answer some of the questions that she refused to or that she evaded, and it will also be my intention to ask the court that Commonwealth bear any expenses associated with us coming back or retaking the deposition.

Mr. Facter: Let me just—my final comment is that I've been in this situation a number of times on both times—

Mr. Fitzgerald: I can imagine.

Mr. Facter: —on both sides, both where I was defending and where I was taking the deposition, and where the instructions not to answer were just 1 or 2, we have almost always been able to resolve the matter by making a quick call to whichever court was overseeing the deposition, and I believe that the refusal to do so is what's going to cause the expense to run up and not the fact that Ms. Murphy does not have detailed examples to provide you with respect to each of the examples in the complaint. But let's go on.

Mr. Fitzgerald: Okay.

(Deposition 90:13–93:11).

The deposition then concluded.

## II.

There are essentially two issues in this case. First, is Protective entitled to know the factual basis for allegations contained in the answer and counterclaim? Second, is Protective entitled to the documents upon which Commonwealth relied to support the allegations contained in the answer and counterclaim? The answer to these questions is fairly simple, but requires some explanation.

### A.

Whether Protective is entitled to know the factual basis of specific allegations in the answer and counterclaim requires an analysis of the following: (a) The provisions of Federal Rule of Civil Procedure 30(b)(6), (b) the applicability of the attorney-client privilege, and (c) the applicability of the work product "privilege." I shall discuss these issues in turn.

First, the provisions of Federal Rule of Civil Procedure 30(b)(6) provides in pertinent part that a party may, in the party's notice to take a deposition, name in the notice as the deponent a corporation. In such an event the corporation must designate one or more officers or directors or managing agents or other persons to testi-

fy on the corporation's behalf. In particular, "the person so designated shall testify as to matters known *or reasonably available to the organization.*" Fed.R.Civ.P. 30(b)(6).

The Rule 30(b)(6) notice to take the deposition in this case was specific regarding the matters about which the deponent would be required to testify. Specifically, the notice (filing 69) suggested that the witness would need to be familiar with the allegations of Commonwealth that Global committed gross negligence in managing the insurance portfolio underlying the insurance treaties, and that Protective committed gross negligence in failing to adequately supervise Global's management of the insurance portfolio underlying the treaties. The notice also required the witness to be able to discuss the nature and amount of damages flowing from the: alleged gross negligence of Protective and Global, the alleged breach of the duty to exercise good faith by Protective and Global, or the alleged misrepresentations. The spokesperson was directed to bring with the person any and all written documents, notes, and memoranda or correspondence in that person's possession, or within that person's control which related to the aforesaid subjects of inquiry.

In *Cates v. LTV Aerospace Corp.*, 480 F.2d 620 (5th Cir.1973) the court identified three reasons why the 1970 amendment to Rule 30(b)(6) was proposed. First, the amendment reduced the difficulty in determining whether a person deposed is a managing agent. Second, the amendment curbed the "bandying" by which various officers of a corporation are deposed, and, in turn, each disclaims knowledge of facts that are clearly known by someone in the organization. Thirdly, the amendment protects the corporation by eliminating unnecessary and unproductive depositions. *Id.* at 623.

■ One of the self-evident propositions respecting the effective implementation of the provisions of Federal Rule of Civil Procedure 30(b)(6) is found in the plain language of the Rule: "The persons so designated shall testify as to matters known or *reasonably available to the organization.*" Fed.R.Civ.P. 30(b)(6) (emphasis added). If the rule is to promote effective discovery regarding corporations the spokesperson must be informed. This means that: "[The corporation] must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the interrogator] and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed by [the interrogator] as to the relevant subject matters." *Mitsui & Co. v. Puerto Rico Water Resources Authority*, 93 F.R.D. 62, 67 (D.P.R.1981) (requiring a corporation to designate a 30(b)(6) spokesperson and imposing fees and sanctions for the failure to do so). Assuming that the subject matter of Protective's inquiry was not objectionable, I am convinced that Commonwealth did not engage in a conscientious good-faith endeavor to designate a person having knowledge of the matters sought by Protective and to prepare that person in order that she could answer fully, completely, unevasively, the questions posed by Protective as to the relevant subject matter.

■ I turn then to Commonwealth's argument that Protective's line of inquiry was improper. During the deposition, Commonwealth essentially took the position that Murphy could not testify as to facts which had been communicated to her by Commonwealth's lawyers. Commonwealth's counsel took the position that such communications were protected by the attorney-client privilege. Counsel was plainly wrong. As our circuit court has explicitly held:

No contention can be made that the attorney-client privilege precludes disclosure of factual information. The privilege does not protect facts communicated to an attorney. *Upjohn Co. v. United States*, 449 U.S. 383, 395–96, 101 S.Ct. 677, 685–86, 66 L.Ed.2d 584 (1981). Clients cannot refuse to disclose facts which their attorneys conveyed to them and which the attorneys obtained from independent sources. *Hickman v. Taylor*, 329 U.S. 495, 508, 67 S.Ct. 385, 392,

91 L.Ed. 451 (1947); 8 J. Wigmore, Wigmore on Evidence § 2317 (McNaughton rev. 1961).

*Sedco Intern., S.A. v. Cory,* 683 F.2d 1201, 1205 (8th Cir.), *cert. denied,* 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982). It is clear that Protective was not seeking communications between client and lawyer, but rather, Protective was seeking the facts supporting the allegations contained in the answer and counterclaim. This essential distinction renders the claim of attorney-client privilege improper.

■■■ What Commonwealth may really be contending is at issue is the so-called work product privilege.[1] Counsel for Commonwealth indicated that at the time of the preparation of the answer and counterclaim, counsel for Commonwealth prepared a document summarizing his opinions concerning what legal claims Commonwealth had and the basis for which counsel believed that legal claims existed (Deposition: 31:2–7). But counsel for Protective made clear that he was "not asking [the deponent] to relate the opinion that your counsel gave you. I'm asking [the deponent] for the facts that support this allegation." (Deposition: 32:13–15). It was equally clear during the taking of Murphy's deposition that what Commonwealth knew and Murphy knew about the facts were facts that had been communicated to Commonwealth by its attorneys.

Apparently what happened was this. Sometime in 1984 Commonwealth took over the records from its agent, Fordingbridge, and refused to pay losses otherwise due Protective (Deposition: 49:5–13). Commonwealth than began receiving requests to pay its share of the losses or to post a letter of credit, but Murphy would not authorize payment as she had questions about the insurance treaty. (Deposition: 50:6–51:1). According to affidavits submitted by Murphy and John A. Dito, a member of the law firm of Buchalter, Nemer, Fields & Younger, the following occurred. On or about January 24, 1986, Murphy contacted a Mr. Ken Cox representing Protective, and she requested the right to conduct an audit with respect to Commonwealth's participation in the reinsurance. Mr. Cox advised by telex that other participants in the reinsurance program were scheduled to audit Global records. In late January of 1986 Murphy advised these other parties that Commonwealth was interested in participating in an audit of Global. Murphy asked the other participants for the names of the auditing company and the lawyers who were commissioning the audit. The other participants gave Murphy the information that the Buchalter firm was the law firm representing the other insurers. (At this juncture it is noteworthy that the Buchalter firm is not counsel of record for Commonwealth in this case.) In February of 1986 Commonwealth then retained the Buchalter firm and joined the other reinsurers in the Global audit commissioned by Buchalter.

The Buchalter audit commenced on or about March 3, 1986, with the auditing firm of Hood, Lempke & Associates retained by Buchalter to conduct the audit. The audit was completed on or about March 19, 1986. On or about March 13, 1986, Commonwealth was told by a demand letter that Protective was authorized to pursue all available legal and administrative remedies against Commonwealth if Protective's demand for funds and a letter of credit were not timely met.

■■ It is this background investigation that trial counsel for Commonwealth apparently evaluated and communicated to Commonwealth and Ms. Murphy. And, it is in this context that the so-called work product doctrine must be evaluated. In my judgment Commonwealth misunderstands the work product doctrine; where a document may be insulated from discovery because of the work product doctrine, the facts

---

1. It is important to distinguish between facts learned by a lawyer, a memorandum or document containing those facts prepared by the lawyer, and the lawyer's mental impressions of the facts. The facts are discoverable if relevant. The document prepared by the lawyer stating the facts is not discoverable absent a showing required by Federal Rule of Civil Procedure 26(b)(3). Mental impressions of the lawyer regarding the facts enjoy nearly absolute immunity. *In re Murphy,* 560 F.2d 326, 336 (8th Cir. 1977).

contained therein must be disclosed in response to a properly worded interrogatory or deposition question. Professor Michael E. Wolfson explains as follows:

The first issue, which seems to bother lawyers more than it should, relates to whether or not the work product doctrine precludes the discovery of relevant facts gathered by the lawyer during his or her efforts on the client's behalf. For example, during the interview of witness A, the lawyer learns of the existence of witness B. Can the lawyer then, in response to an interrogatory requesting the names and addresses of all known witnesses, decline to reveal the existence of witness B based upon the protections of the work product doctrine? The answer to this question was clearly provided by the Supreme Court in *Hickman*. The Court pointed out that where relevant and non-privileged *facts* were contained in an attorney's file, and where discovery was essential to preparation of the opposing party's case, such facts were clearly discoverable or the "liberal ideals of the deposition-discovery portions of the Federal Rules of Civil Procedure would be stripped of much of their meaning."

More recently, the Supreme Court addressed this same problem in the context of the attorney-client privilege. The Court noted that the privilege protected against disclosure of communications between a client and his attorney, but did not protect against disclosure of the underlying facts known by those who communicate with an attorney. Similarly, while witness A's written statement may be protected from discovery as ordinary work product and an interview summary prepared by the lawyer protected from discovery as opinion work product, the basic facts provided by witness A, as long as they are relevant and not protected from disclosure by another evidentiary privilege, are discoverable by the opposing party. Where a document may be insulated from a Request for Production, the facts contained therein must be disclosed in response to a properly worded interrogatory or deposition question.

Attorneys often refuse to disclose during discovery those facts that they have acquired through their investigative efforts and assert, as the basis for their refusal, the protections of the work product doctrine. Where such facts are concerned, as opposed to the documents containing them or the impressions and conclusions drawn from them, they must be disclosed to the opposing party in response to a proper request for discovery. Otherwise, discovery would be a meaningless tool and we would be back to the era before the advent of the Federal Rules of Civil Procedure when "mutual knowledge of all the relevant facts gathered by both parties" was far from the guiding principle of the federal litigation process.

Wolfson, *Opinion Work Product—Solving the Dilemma of Compelled Disclosure*, 64 Neb.L.Rev. 248, 256–57 (1985) (footnotes omitted).

There is simply nothing wrong with asking for facts from a deponent even though those facts may have been communicated to the deponent by the deponent's counsel. But, depending upon how questions are phrased to the witness, deposition questions may tend to elicit the impressions of counsel about the relative significance of the facts; opposing counsel is not entitled to his adversaries' thought processes. *Id.* at 258–262. Here the effort must be to protect against indirect disclosure of an attorney's mental impressions or theories of the case.

The problem in this type of situation is determining the degree to which a particular deposition question elicits the mental impressions of the attorney who communicated a fact to the deponent. In a sense, any fact that a witness learns from his or her attorney presumably reveals in some degree the attorney's mental impressions of the case, or, presuming rationality, the attorney would not have communicated the fact to the client. As I have pointed out previously, it is clearly not the law that a fact is not discoverable because a lawyer communicated the fact to the client. Indeed:

The courts have consistently held that the work product concept furnishes no shield against discovery, by interrogatories or by deposition, of the facts that the adverse party's lawyer has learned, or the person from whom he has learned such facts, or the existence or nonexistence of documents, even though the documents themselves may not be subject to discovery.

8 C. Wright & A. Miller, *Federal Practice & Procedure* § 2023, at 194 (1970) (footnote omitted).

 Thus, the essential question in this case is whether the questions asking Murphy to tell Protective's lawyer what facts she was aware of which supported a particular allegation in the answer and counterclaim improperly tended to elicit the mental impressions of Commonwealth's lawyers. I think the answer is no.

Judge Lord, in *Lance, Inc. v. Ginsburg*, 32 F.R.D. 51 (E.D.Pa.1962) confronted a very similar issue. In *Lance, Inc.*, the court was presented with a suit for unfair competition and trademark infringement. The defendant filed a seventeen-page answer and counterclaim containing a total of sixty-nine paragraphs. The counterclaim sought damages of $125,000.00. Many of the paragraphs of the answer and counterclaim were conclusionary in the sense that they failed to state any facts underlying the allegation. Plaintiff, during the taking of a deposition of defendant, sought to elicit from the defendant the facts on which allegations contained within the answer and counterclaim were based. Plaintiff also proposed to inquire into the factual basis of both the existence and the amount of defendant's damages claimed in the counterclaim. The defendant, upon instruction from his counsel, refused to answer, and a motion to compel answers followed. *Id.* at 52.

First, Judge Lord ruled that counsel was entitled to the facts:

With the substitution of notice pleading for fact pleading, it is only through searching discovery that one party will be able to meet the case of his adversary.

There is, then, no doubt of the plaintiff's right to seek from his opponent the facts upon which he relied in making his pleading allegations.

It is no answer to say that the facts constituting the basis for the conclusionary allegation are within the knowledge of counsel. In *Gaynor v. Atlantic Greyhound Corp.*, 8 F.R.D. 302 (E.D.Pa., 1948), the court said, at page 302:

" * * * However, the opinion in *Hickman v. Taylor*, [329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451] supra, states unqualifiedly that 'A party clearly cannot refuse to answer interrogatories on the ground that the information sought is solely within the knowledge of his attorney.' A fortiori, he cannot refuse to answer interrogatories on the ground that the information is within the knowledge of his attorney and himself. * * * "

*Id.*

Judge Lord concluded secondly that how this information should be elicited was another matter. Judge Lord looked at the complexity of the legal allegations and concluded that the better way to derive the information was by interrogatories with respect to factual allegations respecting the contention of the defendant:

To be sure, the client presumably knows the facts (although not always), but he can hardly be expected to know their legal consequences. This is what lawyers are for. Defendant, of course, when asked the factual basis for what is obviously his lawyer's allegation, could simply aver lack of knowledge. Such an answer not only would not advance plaintiff's pre-trial knowledge, but could conceivably subject defendant to an unwarranted trial hazard on cross-examination. We think the cause of justice and the fruitful advancement of discovery will be better served by refusing plaintiff's motion to compel answers on depositions to inquiries on the factual basis of conclusionary allegations. While, as we have sought to make clear, plaintiff is undoubtedly entitled to such information, we think it could be more expeditiously

and more intelligently obtained by written interrogatories.

*Id.* at 53.

Third, Judge Lord looked at the damage questions and concluded that the deposition could take place with regard to the damage issues because: "Factual knowledge alone (as opposed to factual knowledge underlying legal conclusions) is sought. This, we think, can be conveniently discovered from defendant personally on oral deposition, if plaintiff is otherwise entitled to the information." *Id.*

I believe Judge Lord properly analyzed the situation which is applicable here. There simply is no doubt that Protective is entitled to the information it sought, which was the factual basis for the contentions contained in the counterclaim and answer and the factual basis for the damages claimed. Undoubtedly there is some danger that the mental impressions of Commonwealth's lawyers will be disclosed by answers to such questions as propounded by Protective, but this is always the case. Counsel for Protective made it clear, repeatedly, that he did not want the opinions of counsel, but only the facts. Moreover, as I have noted earlier, Ms. Murphy and Commonwealth had an obligation to insure that Ms. Murphy was reasonably capable of speaking for Commonwealth as a Federal Rule of Civil Procedure 30(b)(6) spokesperson. I think the exchanges recited in the foregoing portions of this memorandum attest to the fact that Ms. Murphy was not well prepared. I conclude that the questions posed by Protective to Murphy did not improperly threaten to disclose the mental impressions of the lawyers for Commonwealth.

■ This then brings me to the issue of whether or not Protective should be forced to use the "contention interrogatory" approach used by Judge Lord in *Lance, Inc.* In *Lance, Inc.,* 32 F.R.D. at 53, Judge Lord was concerned with an unfair competition and trademark infringement case; for example, conclusory allegations were made

that an affidavit under paragraphs 8 and 15 of the Trade–Mark Act of 1946 were invalid. It seemed to Judge Lord that although the inquiring party was entitled to the information, it was unrealistic to expect a lay witness to be able to give that information because the lay witness "can hardly be expected to know their legal consequences." *Id.*

Although the answer and counterclaim (filing 15) of Commonwealth does contain some pure legal conclusions,[2] there are other allegations, particularly at paragraphs 27 and 28 of the answer and counterclaim, for which it might be reasonably expected that an accountant, such as Ms. Murphy, who is in the business of dealing with reinsurance issues, could reasonably be expected to explain during an oral deposition. For example, paragraph 27 suggested that, in pertinent part, certain representations were false and misleading "in that Global did not have in place an apparatus that could handle the insurance business that it was underwriting." (Filing 15, page 9, paragraph 27). For further example, paragraph 28 of the answer and counterclaim suggests that Global's inability to manage properly and efficiently the insurance business was reflected in certain deficiencies, among those being "[e]fforts to bill and recover deductibles and salvage were highly sporadic, resulting in enormous costs to the reinsurers." (Filing 15, page 9, paragraph 28(a)). There is nothing purely legal about these types of allegations; a Federal Rule of Civil Procedure 30(b)(6) spokesperson, who is a qualified accountant, and who has experience handling reinsurance matters, should have no difficulty in explaining the facts underlying such allegations. It is one thing to ask a defendant why an affidavit is "invalid" under the "Trade–Mark Act of 1946" and quite another thing to ask an accountant, who deals with reinsurance issues on an everyday basis, what facts she has in her possession upon which her employer relied when it alleges that "[e]fforts to bill and recover deductibles and salvage

2. Protective, from my reading of the deposition, did not question Murphy about pure legal matters.

were highly sporadic, resulting in enormous costs to the reinsurers." (Filing 15, page 9, paragraph 28(a)). The same thing is true of damages; certainly Ms. Murphy as an accountant, and a person experienced in dealing with reinsurance matters, can explain, albeit only generally perhaps, how, why, and in what measure, her employer claims to be damaged as a matter of fact. *See Lance, Inc.*, 32 F.R.D. at 53.

Accordingly, I shall grant the motion to compel and require that Commonwealth provide Ms. Murphy for a deposition in San Francisco, California, at a date and time convenient for counsel for Protective, the site to be chosen by Commonwealth.

■ I wish to make the following observation to guide counsel. First, as I have said, Ms. Murphy has an obligation to be prepared as a Rule 30(b)(6) spokesperson. Second, Ms. Murphy, to the extent that she is able, must recite the facts upon which Commonwealth relied to support the allegations of its answer and counterclaim which are not purely legal, even though those facts may have been provided to her or her employer by Commonwealth's lawyers. Third, Protective is directed, when formulating questions to Ms. Murphy, to avoid asking questions of Ms. Murphy which are intended to elicit Commonwealth's counsel's advice, Commonwealth's counsel's view as to the significance or lack thereof of particular facts, or any other matter that reveals Commonwealth's counsel's mental impressions concerning this case. *See Ford v. Philips Electronics Instruments Co.*, 82 F.R.D. 359, 361 (E.D.Pa. 1979). Finally, Ms. Murphy is specifically obligated to produce at the deposition such documents coming within the Rule 30(b)(6) notice and request to produce which are not privileged. In this regard, Ms. Murphy is obligated, as is her employer, Commonwealth, to comply with the Rule 30(b)(6) notice to produce, notwithstanding Commonwealth's counsel's belief that it may (or may not) have already complied with similar discovery requests.

### B.

■ Protective asks for fees and expenses from Commonwealth associated with the preparation of this motion, and the expenses of retaking the Murphy deposition. For present purposes, I assume that the provisions of Federal Rule of Civil Procedure 37(a)(4) apply to the issue of fees and expenses and not the provisions of Federal Rule of Civil Procedure 37(b)(2). Although Ms. Murphy and Commonwealth were under a previous order to comply with the notice to take depositions, the issue of whether or not Ms. Murphy should be compelled to answer the questions involved in this motion was not before the court; rather the issue was whether or not Ms. Murphy should be required to appear at a date and place certain. Therefore, I am limited to awarding fees and expenses "incurred in obtaining the order," Fed.R.Civ.P. 37(a)(4). I further believe that I do not have the authority to impose sanctions, such as the award of expenses for the taking of the second deposition, pursuant to Federal Rule of Civil Procedure 37(b)(2), because the expense provisions of 37(a)(4) are more limited than the sanctions under 37(b)(2).

■ Accordingly, I must determine whether or not Protective is entitled to its fees and expenses incurred in obtaining this order, and if so, in what amount. It is clear that I must award fees and expenses under Federal Rule of Civil Procedure 37(a)(4) unless I find that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust. 4A J. Moore, J. Lucas & D. Epstein, *Moore's Federal Practice* ¶ 3702[10] (2d ed. 1988). On the other hand, courts have often denied expenses where there was a genuine disagreement over issues of privilege. *Id.* I make the following observations.

■ First, it is apparent to me that Ms. Murphy was not adequately prepared and that Commonwealth failed to live up to its responsibilities under Federal Rule of Civil Procedure 30(b)(6). Second, although the legal issues surrounding the applicability of the attorney-client privilege or work product doctrine can be complex in the abstract as evidenced by the length of this memorandum, counsel for Protective made

it abundantly clear what he wanted. Like Jack Webb, Protective's counsel wanted "just the facts." Had Ms. Murphy been adequately prepared for the deposition she could have given Protective the facts without unnecessarily divulging either privileged communications or attorney work product.

▇▇▇ Commonwealth strenuously argues that an award of fees and expenses is improper, since it offered to negotiate with Protective and Protective failed to take up Commonwealth's suggestion that the matter be resolved by telephone call to this court. But, I think the parties did in fact engage in substantial negotiations as evidenced by the colloquy between Protective's counsel and Commonwealth's counsel throughout the deposition. Protective made it clear that it did not want attorney-client privileged information and it did not want work product information. Protective wanted the facts. Moreover, inasmuch as I will not award the expenses of retaking the deposition because I do not believe that I have the authority to do so pursuant to Federal Rule of Civil Procedure 37(a)(4), there is no particular reason to credit Commonwealth with the offer to consult with the court by telephone. Even had the parties and the court consulted by telephone, it would have been difficult to assess the matter without a transcript.

As to the appropriate amount, I will enter an order providing that Protective shall file affidavits within a specified period of time, and Commonwealth may either elect to pay the amounts set forth in Protective's affidavit, or by counter-affidavit question the fairness and reasonableness of the amounts claimed. If Commonwealth desires a hearing on the amount of fees it will be required to request a hearing within a specified period of time, or, alternatively, I will resolve the matter on the affidavits. In any event, I award Protective the reasonable expenses incurred in obtaining this order, including attorney's fees, in a sum not to exceed one thousand dollars ($1,000.00).

### C.

▇▇▇ Protective also moves for the production of the Doner–Lembke report, all communications between Commonwealth and other reinsurers concerning the 1986 audit of Global, all communications between Commonwealth and a lawyer and law firm concerning the 1986 audit of Global, and all communications with the accounting firm which conducted the March 1986 audit of Global. The parties dispute whether or not the above entitled information would otherwise be covered by the work-product doctrine.

I assume, for the moment, that the documents requested are work-product documents. If the documents are covered by the work-product doctrine then because they are in fact documents they are explicitly covered by the provisions of Federal Rule of Civil Procedure 26(b)(3). The provisions of Federal Rule of Civil Procedure 26(b)(3) provide that on a showing that the party seeking the work-product document has substantial need of the materials and the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means, the court may order discovery of such material, taking care to protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of the attorney or other representative of the party concerning the litigation. In essence, Federal Rule of Civil Procedure 26(b)(3) provides for discovery of factual work product as opposed to so-called opinion work product.

I do not believe that Protective has shown that it is unable to obtain the substantial equivalent of the material by other means. It may well be that Ms. Murphy can provide Protective with the facts necessary to defend against some or all of the allegations contained in the answer and counterclaim. However, because of Commonwealth's position that she had no obligation to even give the facts, Protective quite properly moved for the production of the documents at this time.

▇▇▇ Due to the resolution of the matter regarding Murphy's obligation to give the facts, I think it appropriate to deny Protec-

tive's motion at this time, without prejudice. Obviously, it would be unjust to award fees and expenses to Commonwealth in this circumstance, since Protective moved for the production of these documents as a consequence of the activities taking place at Murphy's deposition when she was instructed not to recite the facts relating to the amended answer and counterclaim. Accordingly, I shall deny the motion to produce the documents, without prejudice, and I decline to award fees and expenses.[3]

IT IS ORDERED that filing 109 is granted in part and denied in part as follows:

1. The deponent Murphy is required to answer questions concerning the factual basis of Commonwealth's allegations in its answer and counterclaim, including those questions which she refused to answer during the previous deposition;

2. The deposition of Ms. Murphy shall commence in San Francisco, California, the place to be determined by Commonwealth, at a date and time convenient for counsel for Protective;

3. Protective is awarded reasonable fees and expenses in obtaining this order, including attorney's fees, not to exceed the sum of one thousand dollars ($1,000.00);

4. Within seven (7) working days, Protective shall serve and file an affidavit in conformity with the Local Rules of Practice setting forth with particularity its claims for fees and expenses in sufficient detail that the court can determine the fairness and reasonableness of the claim. Within seven (7) working days thereafter Commonwealth may either pay such amount, or if it desires a hearing, it shall within the seven (7) working day period file a request for a hearing and a counter-affidavit sufficiently particular and in conformity with the Local

Rules of Practice establishing why Commonwealth believes the claimed fees and expenses of Protective should not be awarded. Thereafter, the court may order a hearing to determine the fairness and reasonableness of the claimed fees, or if no hearing is requested the court may resolve the matter on the affidavits;

5. The award of fees and expenses is made against Commonwealth, and its attorney, Jeffrey Facter;

6. The portion of the motion to compel regarding the production of documents is denied as premature, without prejudice, with the court finding that the filing of the motion in this regard was substantially justified and that an award of fees and expenses would be unjust under the circumstances.

---

**3.** Commonwealth has an obligation to produce documents, as indicated in the text, pursuant to the Rule 30(b)(6) notice. If Commonwealth believes that documents coming within the purview of the notice are otherwise not discoverable because of a privilege or because of the application of the work product doctrine, it may withhold production of the document and shall then immediately provide a description of the document withheld with as much specificity as is practical without disclosing its contents, in-

cluding the general nature of the document, the identity and position of its author, the date it was written, the identity and position of its addressee, the identities and positions of all persons who were given or have received copies of it, and the dates copies were given to them, and the document's present location and identity and position of its custodian, and the specific reason or reasons why it has been withheld from Production.