**ANDRITZ SPROUT–BAUER, INC., Plaintiff,**

v.

**BEAZER EAST, INC., and Bridon–American Corp., Defendants.**

No. 4:CV–95–1182.

United States District Court, M.D. Pennsylvania.

July 28, 1997.

Steven P. Caley, James P. McCabe, Kelley Drye & Warren, L.L.P., New York City, for Andritz Sprout–Bauer, Inc.

Kenneth R. Bruce, Timothy C. Wolfson, Kimberly J. Koerner, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, for Beazer East, Inc.

Hershel J. Richman, Christopher M. Roe, Eli R. Brill, Dechert Price & Rhoads, Philadelphia, PA, for Bridon American Corp.

McCLURE, District Judge.

**BACKGROUND:**

This action[1] arises out of efforts to recoup environmental contamination cleanup costs

---

1. The cases filed to Civil Nos. 3:CV–95–1182 and 4:CV–96–0124 were consolidated. The action

incurred in connection with two sites owned by plaintiff Andritz Sprout–Bauer, Inc. (Andritz).[2]

One of the sites is located in Muncy Borough and Muncy Creek Township, Lycoming County, Pennsylvania (the Muncy site). Andritz seeks to recover cleanup costs incurred at the Muncy site from defendants Beazer East, Inc. (Beazer)[3] and Bridon–American Corp. (Bridon).

## CREWE, VIRGINIA SITE

The other site which is the subject of this action is located in Crewe, Nottoway County, Virginia (the Crewe site). The Crewe site consists of a 4.37 acre parcel of land on which are situated various structures, including a one-story concrete block building variously used as a building and machine shop, a fabrication shop, a sheet metal repair parts storage area and two sheet metal storage areas. (Plaintiff's amended complaint, ¶ 10)

Only Beazer is a defendant to the claims to recover costs incurred in connection with the Crewe site. Beazer acquired the site from Sprout, Waldron & Company, Inc. (Sprout Waldron) when it acquired all stock and assets of that corporation. Beazer was record owner of the Crewe site from March 1, 1975 through August 4, 1986. Beazer sold the Crewe site to SWM Corp. on or about August 4, 1986. Following a series of intercorporate transfers, Andritz came into ownership of the Crewe site on December 17, 1990.

Sprout Waldron allegedly used the Crewe site from 1961 to March, 1975 for various industrial and manufacturing operations, including the fabrication of sheet metal. Sprout Waldron allegedly maintained or used on the site underground storage tanks (USTs), chemical drum storage areas, a paint sludge pit and various other waste storage, treatment and or disposal facilities.

Plaintiff alleges that during the course of its operations at the Crewe site, Sprout Waldron used, handled or stored a number of substances classified as "hazardous substances" under section 101(14) of CERCLA, 42 U.S.C. § 9601(14). (Plaintiff's amended complaint, ¶ 12).

Andritz alleges, upon information and belief, that when Beazer acquired the site in 1975, Beazer continued essentially the same business and operations conducted by Sprout Waldron over the prior fourteen years and continued the business as a successor-in-interest to Sprout Waldron. It further alleges that, as Sprout Waldron had before it, Beazer used various substances classified as "hazardous substances" under section 101(14) of CERCLA, 42 U.S.C. § 9601(14) and also, like Sprout Waldron before it, used and or disposed of various petroleum hydrocarbons at the Crewe site, including substances classified as "oil" under section 44.34:8 of the Virginia Water Control Law (VaWCL), 62.1 Va.Code. Ann. § 44.34:8, in addition to substances classified as "solid waste" and or "hazardous waste" under sections 1004(27) and 1004(5) of RCRA, 42 U.S.C. §§ 6904(27) and 6904(5).

### Claims asserted

Andritz asserts claims under the following federal and state laws to recover past and future costs incurred in connection with the Crewe site: 1) sections 107(a) and 113(f)(1) of CERCLA, 42 U.S.C. §§ 9607(a)(2) and 9613(f)(1) (Counts I and II, respectively); 2) section 7002(a)(1)(B) of the Resource Conservation and Recovery Act (RCRA) for injunctive relief, reimbursement and or contribution, 42 U.S.C. § 6972(a)(1)(B) (Count III); 3) sections 9001–9003 of RCRA, 42 U.S.C. §§ 6991a, 6991b and 6991c and for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 (Count IV); 4) the Virginia Water Control Law (VaWCL), 62.1 Va.Code An. § 44.34:18 (Count V); 5) a Virginia common law claim for negligence *per se* based on the alleged violation of the VaWCL (Count VI); 6) a claim in strict liability asserted under Virginia common law

---

filed to 4:CV–96–0124 was filed in the United States District Court for the Eastern District of Virginia. In an order dated January 18, 1996 Judge James R. Spencer of the United States District Court for the District of Virginia transferred the action to this court pursuant to 28 U.S.C. § 1404(a).

**2.** We use the term Andritz here to refer to the corporation currently known as Andritz–Sprout Bauer, Inc., as well as to any predecessor corporation whose interests and or rights have been acquired by it.

**3.** Beazer was formerly known as Koppers Company, Inc.

based on the alleged storage of hazardous substances on Beazer property (Count VII); 7) a negligence claim asserted under Virginia law (Count VIII); 8) a private nuisance claim (Count IX); 9) a public nuisance claim (Count X); 10) a trespass claim (Count XI); 11) a claim for contribution under 8.01 Va. Code Ann. § 34 *et seq.* (Count XII); 12) a claim for indemnification and contribution under Virginia common law (Count XIII); 13) a claim for restitution (Count XIV); and 14) a claim for declaratory judgment asserted under 28 U.S.C. §§ 2201 and 2202. (Count XV).

Beazer moves to dismiss thirteen of the fifteen counts asserted. Beazer moves to dismiss all but the two CERCLA counts (Counts I and II).

## MOTIONS ADDRESSED

The motions addressed by this memorandum and the accompanying order are: 1) a motion by Beazer to dismiss Andritz' amended complaint seeking costs associated with the Crewe site;[4] 2) a motion to compel the production of documents filed by Bridon against Andritz (record document no. 93); 3) a motion to compel filed by Beazer (record document no. 111); and 4) a cross-motion for the issuance of a protective order filed by Andritz (record document no. 122).

For the reasons which follow, we will enter an order: granting in part and denying in part all four motions.

## MOTION TO DISMISS BY BEAZER

### Rule 12(b) standard

In deciding defendants' motion, we are "required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the non-movant." *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). "In determining whether a claim should be dismissed under Rule 12(b)(6)," we look "only to the facts alleged in the complaint and its attachments without reference to other parts of the record." *Id.* Dismissal is not appropriate unless "it clearly appears that no relief can be granted under any set of facts that could be proved consistently with the plaintiff's allegations." *Id.*

### Count III

Count III of plaintiff's amended complaint asserts a claim under RCRA, 42 U.S.C. § 6972(a)(1)(B) for monetary damages sought as reimbursement for past and future cleanup costs. Beazer moves to dismiss Count III on the ground that the relief sought is foreclosed by the United States Supreme Court's decision in *Meghrig v. KFC Western, Inc.,* —— U.S. ——, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996).

In *Meghrig,* the Court ruled that the citizens' suit provision of RCRA, 42 U.S.C. § 6972(a), does not authorize the filing of a private action to recover past cleanup costs incurred in connection with a site which poses no imminent threat of endangerment to health or the environment.

KFC Western, Inc (KFC) sued past owners of the site to recover cleanup costs it incurred in removing oil-contaminated soil. Distinguishing the citizen suit provisions found respectively in RCRA, and CERCLA, the Supreme Court found that RCRA provides no such relief. RCRA, the Court stated, "is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards." *Id.* at ——, 116 S.Ct. at 1254, 134 L.Ed.2d at 126. Its primary purpose is, rather, "to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" *Id.,* quoting 42 U.S.C. § 6902(b). CERCLA, on the other hand, is more directly concerned with the cleanup of toxic waste sites and ensuring that means are made available to carry out such work.

These differing purposes are reflected in the differing remedies Congress created under the two statutes. CERCLA provisions expressly grant private citizens a right of recovery for cleanup costs. Costs "incurred by any . . . person consistent with the nation-

---

**4.** The motion to dismiss portions of the complaint seeking to recover costs associated with the Muncy site was addressed in a separate order and memorandum.

al contingency plan" are recoverable. *Id.* at ——, 116 S.Ct. at 1255, 134 L.Ed.2d at 127, quoting 42 U.S.C. § 9607(a)(4)(B). RCRA's citizen-suit provisions are more restrictive and more narrowly focused. *Id.*

The Court further found that RCRA's emphasis on remedying threats posing an "imminent and substantial endangerment to health or the environment" is inconsistent with the assertion that it was intended by Congress to provide a vehicle for the recovery of costs incurred for past cleanup operations. If the danger has been remedied and the hazardous material removed from the site, there is, by definition, no longer an imminent or substantial threat of harm to the public health or the environment.

Another factor which weighed strongly in the Court's conclusion that Congress did not intend to create a private cause of action under RCRA is that it does not define the parameters of such a cause of action or spell out the requirements and procedures for pursuing it. Most notably absent are: 1) a statute of limitations for bringing such an action—in contrast, CERCLA establishes a limitations period for private actions—42 U.S.C. § 9607; or 2) a requirement that the plaintiff establish that the costs it seeks to recover are reasonable and necessary, an element, which, again, Congress took care to spell out in CERCLA in the form of the requirement that the plaintiff prove the costs incurred were consistent with the national contingency plan. *Id.* at ——, 116 S.Ct. at 1255, 134 L.Ed.2d at 128, citing 42 U.S.C. § 9607(a)(4)(A) and (B).

The Supreme Court also rejected the suggestion that even though Congress did not expressly provide for such a cause of action, one could be inferred based on the fact that: 1) Congress did not bar private claims; and 2) so long as it is not taken away by Congress, the federal courts retain, in all situations, their inherent authority to grant equitable relief when necessary to further justice. *Id.* at —— – ——, 116 S.Ct. at 1255–56, 134 L.Ed.2d at 128–29. The Court stated that where Congress has provided "elaborate enforcement provisions" for remedying the violation of a federal statute, as Congress has done with RCRA and CERCLA, "it cannot be assumed that Congress intended to authorize by implication additional judi-

cial remedies for private citizens suing under" the statute.

*Id.* at ——, 116 S.Ct. at 1256, 134 L.Ed.2d at 129, citing *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 14, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981).

The Court noted, however, that non-availability of costs under RCRA does not foreclose the claimant from seeking past costs through other avenues. Remedies available under other federal or state statutes and at common law are, in fact, specifically preserved by RCRA, 42 U.S.C. § 6972(f), and can be invoked by private parties to recover past costs.

■ The Supreme Court's ruling in *Meghrig* clearly precludes Andritz from pursuing any claim under RCRA for costs incurred prior to the filing of this action. Left open, however, in *Meghrig*, was the question of whether plaintiffs may recover under RCRA the costs they have incurred or will incur for cleanup efforts conducted after they invoked the statutory process and initiated legal action.

The district courts which have considered this issue in the wake of *Meghrig* are divided. Some courts have ruled that the Supreme Court's reasoning is inconsistent with allowing a private citizen suit under RCRA for costs incurred after the statutory process has been invoked. That was the holding of the United States District Court for the Northern District of Illinois in *Agricultural Excess and Surplus Insurance Company v. A.B.D. Tank & Pump Co.*, 1996 WL 515088 (N.D.Ill. Sept. 6, 1996) (*Agricultural Excess II* ).

After carefully considering the Supreme Court's holding and rationale in *Meghrig*, the United States District Court for the District of Illinois found "that Plaintiffs may not recover cleanup costs paid out after the invocation of RCRA's statutory process." *Id.* at *3. Looking to the Court's comparison of RCRA and CERCLA and the remedies afforded by each, the court found that the absence of a statutory scheme governing the pursuit of such claims under RCRA signaled Congress' intent not to make such relief available to private parties. *Id.*

Although Agricultural Excess alleged, as Andritz does here, that substances found at the site posed "an imminent endangerment" to the public health and safety and pointed out that, unlike the situation in *Meghrig,* cleanup efforts were still underway, the court was unswayed by these arguments. It did not find these asserted distinctions a sufficient basis for interpreting RCRA as providing a cause of action for current and future costs. The court concluded that neither the Supreme Court's ruling in *Meghrig,* nor the remedial language of CERCLA and RCRA distinguish between cleanup costs incurred before RCRA has been invoked from those incurred afterwards. It stated:

> [T]he Court's reasoning—that the distinction between the remedial language in CERCLA and RCRA evidences Congress' intent to preclude recovery of the former— applies equally well to recovery of the cleanup costs incurred after invocation of RCRA. *Agricultural Excess II,* 1996 WL 515088 at *3.

Other courts have reached the opposite conclusion, finding that the Supreme Court's reasoning in *Meghrig* does not foreclose a right of private action under RCRA to recover costs incurred after invoking the statutory process.

■ After giving due consideration to the underpinnings of each conclusion, we are firmly persuaded that inferring such a cause of action would be inconsistent with the Supreme Court's interpretation of RCRA in *Meghrig.* A major factor in the Court's ruling was the absence of a statutory scheme governing the filing and pursuit of such claims. Had it been Congress' intent to provide such a cause of action, a framework would have been provided in the statute. That was the conclusion the Court reached in contrasting RCRA with CERCLA. The concerns the Court expressed about straying from congressional intent are no less persuasive in this context than in the context of past costs. No framework has been provided by Congress for pursuing a private right of action for costs, a clear signal that Congress did not intend to create such a cause of action.

For all of these reasons, we will dismiss Count III to the extent it asserts a claim for past or future cleanup costs.

The motion to dismiss Count III will, therefore, be granted.

### Count IV

Count IV of Andritz' amended complaint asserts a claim for declaratory relief under RCRA. Andritz seeks an order declaring Beazer "solely and entirely liable for all future costs necessary to respond to and abate the release and threatened release of substances from or occasioned by the USTs owned and operated by Beazer Koppers and or SWC at the Site that were discontinued from use prior to November 8, 1984." (Amended complaint, ¶ 63).

Andritz alleges that under section 9001(3)(B) of RCRA, 42 U.S.C. § 6991(3)(B), Beazer remains the "owner," for statutory purposes, of USTs located on-site, has not complied with applicable federal statutory requirements, and is, therefore, liable for any resulting violations of RCRA, including the release or threatened release of hazardous substances from the USTs on the site.

Beazer moves to dismiss on several grounds. It argues, *inter alia,* that: 1) no actual controversy exists, making declaratory relief unavailable; 2) RCRA's citizen suit provision, 42 U.S.C. § 6972, does not apply to the RCRA provisions governing USTs, since such actions taken with respect to petroleum-containing USTs are governed exclusively by Title IX of RCRA; 3) private citizens have no right or authority to enforce RCRA's UST provisions; 4) the violations alleged are "wholly past" such that no cause of action exists under the Supreme Court's holding in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987); and 5) no liability is imposed under section 9003 of RCRA, the sole purpose of which is to authorize the Administrator of the Environmental Protection Agency (EPA) to promulgate regulations.

All of these arguments are without merit.

USTs are regulated by Subchapter IX of RCRA, 42 U.S.C. §§ 6991–6991i. Owners and responsibilities they bear are divided into

two categories, based on the date of last use. November 8, 1984 is the dividing line. Section § 6991(3)(A) applies to USTs "in use on November 8, 1984, or brought into use after that date" and defines owners of such tanks to include "any person who owns [a UST used for certain purposes]." 42 U.S.C. § 6991(3)(A). Section 6991(3)(B) applies to USTs "in use before November 8, 1984, but no longer in use on November 8, 1984" and defines the owners of such tanks to include "any person who owned such tank immediately before discontinuation of its use." 42 U.S.C. § 6991(3)(B). Andritz asserts that Beazer falls into the latter category, since it owned the USTs at issue on and before November 8, 1984, and they have not been used subsequent to that date.

■ It is settled that section 6972(a) of RCRA does provide a right of private action against the statutory owners to compel the remedying of hazards associated with USTs. See *Agricultural Excess and Surplus Insurance Company v. A.B.D. Tank & Pump Co.*, 878 F.Supp. 1091, 1094–95 (N.D.Ill.1995) (*Agricultural Excess I* ) (action brought against the installer of the UST).

■ Further, past owners have a continuing obligation to comply with UST regulations and take "corrective action following the confirmed release of a regulated .substance." *Dydio v. Hesston Corp.*, 887 F.Supp. 1037, 1045 (N.D.Ill.1995). Looking to the RCRA definition of an "owner" and the fact that RCRA regulations apply to USTs taken out of operation by November 8, 1984, the court reasoned that Congress intended to impose current RCRA obligations on past owners. *Id.*

Beazer urges this court to follow the holding in *Winston v. Shell Oil Co.*, 861 F.Supp. 713, 718 (C.D.Ill.1994) (McDade, J.). In *Winston*, Judge McDade of the United States District Court for the Central District of Illinois held that petroleum leaks from

USTs are exclusively regulated under subtitle IX of RCRA, 42 U.S.C. §§ 6991, *et seq.*, and, as a result, are not subject to the citizen suit provision of RCRA.

Last year, Judge McDade abrogated his ruling in *Winston* on this issue and ruled, in *Waldschmidt v. Amoco Oil Company*, 924 F.Supp. 88 (C.D.Ill.1996), that petroleum leaks from USTs are not regulated exclusively by Subtitle IX of RCRA, and that private causes of action for such harm are available under RCRA. Noting that *"Winston* is contrary to every other court which has considered this issue," *Id.* at 90,[5] Judge McDade found himself compelled to "reexamine" the decision in *Winston.*

Judge McDade looked to the controlling statutory provisions and to the district court ruling in *Zands v. Nelson*, 779 F.Supp. 1254 (S.D.Cal.1991), *modified*, 797 F.Supp. 805 (S.D.Cal.1992). Citing the citizen suit provision of 42 U.S.C. § 6972(a)(1)(B), Judge McDade found that in order for it to apply, "the petroleum contamination must constitute either solid or hazardous waste." *Waldschmidt*, 924 F.Supp. at 90. Subtitle III of RCRA, 42 U.S.C. §§ 6921–6939e, governs solid waste management. "Solid waste" is defined by it as "any ... discarded material, including ... liquid, semisolid ... material resulting from commercial ... operations ..." 42 U.S.C. § 6903(27).

Under RCRA regulations the term "discarded" can refer to "any material which is", among other things, "abandoned." 40 C.F.R. § 261.2(a)(2)(I). The regulations further provide that materials constitute "solid waste" if they are abandoned by virtue of being "[d]isposed of." 40 C.F.R. § 261.2(b)(1). Disposal is defined by the Act as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid liquid waste or hazardous waste into or on any land or water so that such solid waste or

---

5. Judge McDade cited, as examples, the holdings in:

1) *Nicholas J. Murlas Trust v. Mobil Oil Corp.*, 1995 WL 505468 (N.D.Ill. Aug. 18, 1995);
2) *Dydio v. Hesston Corp.*, 887 F.Supp. 1037 (N.D.Ill.1995);
3) *Agricultural Excess and Surplus Ins. Co. v. A.B.D. Tank & Pump Co.*, 878 F.Supp. 1091 (N.D.Ill.1995);

4) *Craig Lyle Ltd. Partnership v. Land O'Lakes, Inc.*, 877 F.Supp. 476 (D.Minn.1995);
5) *Dominick's Finer Foods, Inc. v. Amoco Oil Co.*, 1993 WL 524808 (N.D.Ill.Dec. 15, 1993);
6) *Paper Recycling, Inc. v. Amoco Oil Co.*, 856 F.Supp. 671 (N.D.Ga.1993); and
7) *Zands v. Nelson*, 779 F.Supp. 1254 (S.D.Cal. 1991), *modified*, 797 F.Supp. 805 (S.D.Cal. 1992).

hazardous waste or any constituent thereof may enter the environment ..." 42 U.S.C. § 6903(3).

Looking to the district court's analysis in *Zands,* Judge McDade concluded: "a careful reading of the chain of definitions indicates that solid waste is defined as the leaking of any solid waste." *Waldschmidt,* 924 F.Supp. at 90, quoting *Zands,* 779 F.Supp. at 1262. "Despite this circular definition, the *Zands* court found——and this Court agrees——that the definition of solid waste under RCRA is very broad." *Id.* "Once 'petroleum leak[s] into soil or groundwater [it] ceases to be useful.'" *Id.,* quoting *Craig Lyle Ltd. Partnership v. Land O'Lakes, Inc.,* 877 F.Supp. 476, 482 (D.Minn.1995). Further, "'petroleum left behind from commercial operations comports with being abandoned.'" *Id.,* quoting *Land O'Lakes,* 877 F.Supp. at 482.

Judge McDade's rejection in *Waldschmidt* of the holding in *Winston* was based also on his conclusion that he had, in the latter decision, "fundamentally misconstrued" the court's holding in *Edison Electrical Institute v. United States Environmental Protection Agency,* 2 F.3d 438 (D.C.Cir.1993), a case upon which he relied in concluding that petroleum USTs are regulated solely and exclusively by subchapter IX of RCRA. *Waldschmidt,* 924 F.Supp. at 91, quoting *Winston,* 861 F.Supp. at 717.

Because this reliance was in error, Judge McDade found in *Waldschmidt* that he was further obliged to consider whether any provisions of subchapter IX *prevent* a citizen suit under section 6972(a). On this point, he concluded that: "[E]ven though petroleum is a regulated substance under subchapter IX, section 6991(2) does not bar petroleum from also being considered a solid or hazardous waste under section 6972(a)(1)(B)." *Waldschmidt,* 924 F.Supp. at 91, n. 7. Nothing, he found, bars citizens from filing a private action for alleged violations caused by petroleum-containing USTs. On this point, Judge McDade stated:

> "While subchapter IX only explicitly provides for the Administrator to issue orders requiring compliance with the subchapter and authorizes the Administrator to bring a civil action to enforce such orders, nothing in subchapter IX indicates that that subchapter was intended to pro-

vide the exclusive remedy for petroleum leaks from USTs." ... [Citation omitted.] ... Moreover, subsections 6972(b)(2)(A), (B), and (C) provide "the exceptions to a private citizen's right to bring suit pursuant to section [6972(a)(1)(B) ]." ... [Footnote omitted.]. *Land O'Lakes,* 877 F.Supp. at 482. None of these exceptions include any "provision prohibiting citizen suits based on UST petroleum leaks or spills." *Id.* In addition, "[w]hen Congress explicitly enumerates exceptions to a statutory provision, a court cannot infer additional exceptions without evidence of contrary legislative intent." *Id.* (citing *Andrus v. Glover Const. Co.,* 446 U.S. 608, 616–17, 100 S.Ct. 1905, 1910, 64 L.Ed.2d 548 (1980)). **The Court finds that subchapter IX does not exclusively regulate petroleum contamination due to a leaking UST. Consequently, subtitle IX does not bar a citizen suit under either subsections 6972(a)(1)(A) or (a)(1)(B). The Court's prior decision in *Winston* that petroleum is exclusively regulated under subtitle IX of RCRA is abandoned.** *Waldschmidt,* 924 F.Supp. at 91–92 (Bold emphasis supplied.).

*Winston* is the only case Beazer relies upon for its contention that there is no private right of action for UST violations. *Winston* and its underpinnings were abandoned by Judge McDade in *Waldschmidt,* leaving Beazer without support for its contention that no private right of action exists for harm caused by petroleum leaked from USTs.

Moreover, the court's reasoning in *Waldschmidt,* and its analysis of RCRA and the decisions interpreting it, are far more persuasive to this court, and are clearly more solidly based, than the contrary conclusion reached in *Winston.* For these reasons, we reject the argument that no private cause of action exists under RCRA for violations resulting from leakage from petroleum-containing USTs.

Beazer's other objections to Andritz' right to bring a private cause of action are similarly without merit. Contrary to Beazer's contentions, Andritz does allege an actual case or controversy. After performing a preliminary site assessment, Andritz notified

Virginia environmental authorities of the suspected presence of contaminants at the site. Authorities then directed Andritz to conduct site characterization and investigatory activities, to analyze the data collected, and to perform corrective and remedial measures at the site. (Amended complaint, ¶¶ 19–20 and 26)

■ Nor are the violations Andritz complains of wholly past. *Gwaltney* addressed the need to demonstrate that alleged violations are not "wholly past" to establish federal jurisdiction over the alleged violation under the federal Clean Streams Law. Those requirements are not applicable here, where the threatened hazard consists, not of discharges into a moving body of water, which will by their very nature be dissipated and diluted within a relatively short time, but rather of substances allegedly discharged into the soil and the groundwater table, which generally remain a source of contamination and potential harm until removed by the authorities or the owner.

Beazer's motion to dismiss Count IV will, therefore, be denied.

### Count V—Virginia Water Control Law

Count V asserts a claim under the Virginia Water Control Law (VaWCL or the Act), Va.Code Ann. § 62.1–44.34:18.

■ The VaWCL "imposes strict liability for discharges of oil onto private and public lands." *Gollobin v. Air Distributing Co.*, 838 F.Supp. 255, 257 n. 7 (E.D.Va.1993).

The VaWCL prohibits the discharge of oil "into or upon state waters, lands or storm drain systems." Va.Code Ann. § 62.1–44.34:18(A). Liability attaches under the Act to "any person" or "any operator of any facility" who discharges, causes or permits a discharge of oil into or upon state waters, lands or storm drain systems or who causes or permits a "substantial threat of such discharge." Va.Code Ann. § 62.1–44.34:18(B). Any person causing such harm is, under the Act, liable to "any person for injury or damage" to that individual's "person or property, real or personal, loss of income ... loss of the use of the damages property" and other monetary losses. Va.Code Ann. § 62.1–44.34:18(C).

Beazer argues that no such recovery is available to Andritz under the VaWCL since the Act applies only to violations existing at. the present time. Beazer argues that it has not been the record owner of the Crewe site since it transferred the property to SWM Corp. in 1986 and could not, therefore, be committing any violation of the VaWCL at present.

■ We are persuaded that Beazer's interpretation of the Act is too narrow, and that its coverage is not limited to persons or facilities currently discharging oil into or on state or private lands. Although there is little case law interpreting the VaWCL and there appears to be no authority addressing the specific issue before us, the Act is remedial in nature and the controlling language is fairly inclusive. Coverage extends to "any person discharging, causing or permitting a discharge of oil ..." Va.Code § 62.1–44.34:18(C). These considerations lead us to conclude that Virginia courts would not construe the statute as narrowly as Beazer urges us to do. See, e.g., *Gollobin*, 838 F.Supp. at 257–58.

Beazer's motion to dismiss Count V will, therefore, be denied.

### Count VI—Negligence per se

Andritz asserts a claim for negligence *per se* based on Beazer's alleged violation of the VaWCL. Beazer argues that this cause of action cannot survive because the action it is contingent upon, the claim asserted under the VaWCL, must be dismissed. We have already rejected that argument.

■ Beazer also argues that Andritz is not within the class of persons the VaWCL was intended to protect, a condition barring it from asserting a claim of negligence *per se.* It is true that under Virginia law, the individual suing on a claim of negligence per se must be within "the class for whose benefit or protection the law was enacted," *Smith v. Transit Co.*, 206 Va. 951, 147 S.E.2d 110, 114–15 (1966), and equally true that the doctrine of negligence per se does not create a cause of action where none otherwise exists. *Butler v. Frieden*, 208 Va. 352, 158 S.E.2d 121, 123 (1967).

■ Here, the statute itself grants private individuals who suffer a loss to their

property or business due to the discharge of oil on state premises the right to sue for compensation. Individuals so injured, are, therefore, clearly within the class the Commonwealth sought to protect with the passage of the VaWCL.

### Virginia five-year statute of limitations

Beazer also challenges Andritz' negligence *per se* claim, and the other common law tort claims it asserts, as barred by Virginia's five-year statute of limitations applicable to claims for injury to property Va.Code § 8.01–243(B).

The action to recover costs incurred in connection with the Crewe site was filed on August 23, 1990. Beazer asserts that Andritsz' cause of action in tort accrued, at the latest, on August 4, 1986, the date when its predecessor corporation acquired the site from Beazer. The statute of limitations, therefore expired, Beazer contends, on August 4, 1991, long before this action was filed.

As a general rule, the statute of limitations begins to run when the cause of action accrues, that is, when the injury or harm being sued for occurs. Virginia statutory law provides:

6. Section 8.01–233 provides that:
> A. A defendant who pleads a counterclaim or cross-claim shall be deemed to have brought an action at the time he files such pleading.
> B. If the subject matter of the counterclaim or cross-claim arises out of the same transaction or occurrence upon which the plaintiff's claim is based, the statute of limitations with respect to such pleading shall be tolled by the commencement of the plaintiff's action.
> Va.Code § 8.01–233.

7. Section 8.01–245 provides:
> A. No action shall be brought upon the bond of any fiduciary except within ten years next after the right to bring such action shall have first accrued.
> B. When any fiduciary has settled an account under the provisions of Title 26, and whether or not he has given bond, a suit to surcharge or falsify such account, or to hold such fiduciary or his sureties liable for any balance stated in such account, to be in his hands, shall be brought within ten years after the account has been confirmed.
> C. In actions upon the bond of any personal representative of a decedent or fiduciary of a person under a disability against whom an execution has been obtained or where a court acting upon the account of such representative or committee shall order payment or delivery of estate in the hands of such committee and representa-

In every action for which a limitation period is prescribed, the right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of injury to the person or damage to property ... and not when the resulting damage is discovered, **except where the relief sought is solely equitable or where otherwise provided under § 8.01–233, subsection C of § 8.01–245, §§ 8.01–249, 8.01–250 or other statute.**

Va.Code Ann. § 8.01–230.

Under Virginia law, the discovery rule applies only in a limited number of situations specified by statute. None of the exceptions listed in the statute applies to the facts presented here. Virginia Code section 8.01–233 deals with actions brought on a counterclaim or cross-claim. Va.Code § 8.01–233.[6] Section 8.01–245 deals with actions filed upon the bond of any fiduciary or suits filed against fiduciaries themselves. Va.Code § 8.01–245.[7] Section 8.01–250 deals with the limitations period for actions for damages arising out of defective or unsafe condition of improvements to real property.[8] Plaintiff has not

tive, the cause of action shall be deemed to accrue from the return day of such execution or from the time of the right to require payment or delivery upon such order, whichever shall happen first.
Va.Code § 8.01–245.

8. Section 8.01–250 provides:
> No action to recover for any injury to property, real or personal, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, nor any action for contribution or indemnity for damages sustained as a result of such injury, shall be brought against any person performing or furnishing the design, planning, surveying, supervision of construction, or construction of such improvement to real property more than five years after the performance of furnishing of such services and construction.
> The limitation prescribed in this section shall not apply to the manufacturer or supplier of any equipment or machinery or other articles installed in a structure upon real property, nor to any person in actual possession and in control of the improvement as owner, tenant or otherwise at the time the defective or unsafe condition of such improvement constitutes the proximate cause of the injury or damage for which the action is brought; rather each such action shall be

directed our attention to any other Virginia statute which defers the accrual date in cases of environmental contamination.

■ Since the cause of action accrued on the date of transfer, or earlier, and there appears to be no basis under Virginia law for deferring the accrual date, we conclude that all claims subject to the five-year Virginia statute of limitations are time-barred.

This includes the strict liability claim asserted in Count VII, the negligence claim asserted in Count VIII, the claims of private and public nuisance asserted in Counts IX and X, respectively, and the claim for trespass asserted in Count XI.

The motion to dismiss Counts VI, VII, VIII, IX, X and XI will, therefore, be granted on the grounds that all such claims are time-barred under Virginia's five-year statute of limitations.

### Count VII—strict liability

■ The claim for strict liability asserted in Count VII is also subject to dismissal on another ground. Such claims have been permissible only against neighboring landowners. Most courts have refused to extend the scope of the cause of action to include claims against former owners. For the reasons which follow, we find that although there appears to be no Virginia appellate case law directly on point, the Virginia Supreme Court would conclude, as have many other courts, that expanding the cause of action to include such claims would be inconsistent with its historical roots and with the *Restatement (Second) of Torts* section on which it is based.

The requirements for establishing a claim of strict liability are set forth in section 519 of the *Restatement (Second) of Torts.* See, e.g., *Cross Oil Company v. Phillips Petroleum Company,* 944 F.Supp. 787, 789 (E.D.Mo. 1996). Section 519 provides:

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

brought within the time next after such injury occurs as provided in ss 8.01–243 and 8.01–246.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Section 520 defines the parameters for determining whether an activity is abnormally dangerous. It provides:

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

*Restatement (Second) of Torts,* §§ 519 and 520 (1976).

There is little question that the use and storage of hazardous substances and related waste and byproducts, as alleged by Andritz, can constitute an abnormally dangerous activity for section 520 purposes.

Few jurisdictions have allowed a successive owner to bring an action under sections 519 and 520. One jurisdiction which has ruled such claims viable is New Jersey. In *T & E Industries, Inc. v. Safety Light Corporation,* 123 N.J. 371, 587 A.2d 1249, 1259 (1991), the Supreme Court of New Jersey held that the current owner can assert a cause of action in strict liability for abnormally dangerous activities against a predecessor in title who allegedly disposed of radium on the premises. The court focused on the dangers posed by defendants' alleged conduct and on the inappropriateness of the activity, concluding that those who, to gain some advantage or benefit for themselves, introduce or create an extraordinary risk of harm to the community should, as a matter of policy, bear the

Va.Code § 8.01–250.

risk their acts create to those who acquire title after them. *Id.* 587 A.2d at 1257. These considerations, the court concluded, justify extending strict liability to successors in title who suffer or are required to redress the consequences of harm caused by the activities of prior owners. See also: *Prospect Industries Corp. v. Singer Co.,* 238 N.J.Super. 394, 569 A.2d 908, 911 (1989).[9]

That was also the holding of the United States District Court for the District of Maine in *Hanlin Group v. Intern. Minerals & Chemical Corp.,* 759 F.Supp. 925 (D.Me. 1990). The district court held that a strict liability claim could be asserted against a prior owner who had disposed of mercury and carbon tetrachloride on the property.

The majority of courts have, however, ruled that such claims do not fit within the parameters of the cause of action defined in *Restatement of Torts (Second), sections* 519 and 520. That was the holding of the Maryland Court of Appeals in *Rosenblatt v. Exxon Company,* 335 Md. 58, 642 A.2d 180 (1994). There, a claim in strict liability was asserted by the current tenant of commercial property against a former tenant and the operators of a gasoline station for harm caused by an alleged leak in the gasoline storage tanks. Among other reasons, the court found extending strict liability under the facts alleged inconsistent with *Restatement of Torts (Second),* section 519. *Id.* 642 A.2d at 188.

In *Rosenblatt,* the court looked to the justifications for the application of strict liability, one of which is to insulate from harm neighboring landowners who have no other means of redress against neighboring landowners who harm their property by conducting abnormally dangerous activities on their own properties. The same justification does not apply when the party alleging harm is a subsequent owner. Such parties have, the court held, the ability to insulate themselves from harm by carefully and thoroughly inspecting the property and by seeking full disclosures about prior activities on the site before agreeing to purchase the land. The

court found it unreasonable to hold prior owners liable to remote purchasers who fail to inspect the property adequately or research its history before agreeing to make the purchase.

In *Jones,* 945 F.Supp. at 1050–52, the United States District Court for the District of Texas rejected application of strict liability in this context for two reasons. The court found that: 1) the Texas courts have repudiated the strict liability principles set forth in *Restatement of Torts (Second),* §§ 519 and 520; and 2) the application of strict liability against prior land owners is inconsistent with the principles set forth in sections 519 and 520. *Id.*

Following the lead of the Maryland Court of Appeals in *Rosenblatt* and of other state and federal courts, the district court stated in Jones:

Even if Texas law recognized the doctrine of abnormally dangerous activities as a basis for strict liability, the plaintiffs' claims do not fall within the parameters of section 519 of the *Restatement. Section* 519 imposes liability on one engaging in an abnormally dangerous activity "for harm to the person, land, or chattels of *another.*" (emphasis added). See *Wellesley Hills Realty Trust[ v. Mobil Oil Corp.],* 747 F.Supp. [93, 102 (D.Mass.1990) ] . . . [Other citation omitted.] . . . The doctrine applies, therefore, to claims by an occupier of land harmed by an activity abnormally dangerous in relation to the area, which is carried on by a contemporaneous occupier of neighboring land. *Rosenblatt,* 642 A.2d at 186. **The plaintiffs' claims call for an expansion of this doctrine to claims by subsequent occupants of the land on which the activity took place. See** *id.* **If Texaco's disposal of oil sediment and other wastes in earthen pits on the land constituted an abnormally dangerous activity, it engaged in the offensive activity at the time it owned the property. Thus, if Texaco caused harm to the**

**9.** In both cases, the New Jersey courts rejected the contention that by agreeing to purchase the property "as is," the purchasers waived any right to bring a strict liability claim, since there was no evidence that the purchasers were aware of the contamination when they agreed to purchase

the premises. A party ignorant of the presence of an abnormally dangerous condition could not reasonably be held to have assumed the risk, the courts held. *T & E Industries,* 587 A.2d at 1259 and *Prospect Industries Corp.,* 569 A.2d at 912.

property, it was to land it owned, not to the "land of another." Such activity falls outside the scope of § 519. See *Wellesley Hills Realty Trust,* 747 F.Supp. at 102; *Rosenblatt,* 642 A.2d at 188; ... [Other citation omitted.] ... as the court explained in *Wellesley Hills Realty Trust:*

> At the time Mobil operated the gas station and releases of oil inflicted harm to the property, Mobil owned the property. Thus, Mobil's operation of the gas station caused harm to property *of its own,* not property of *another.* The site became property of WHRT only after the contamination, the harm, had occurred. No matter how viewed, therefore, Mobil can not be accused of having caused harm to the property of another because of release of oil on its own property resulting from its operation of a gas station.

747 F.Supp. at 102 (emphasis in original). The court concluded, "**It would be nonsensical to even formulate a rule that an actor is strictly liable for harm inflicted on his or her own property or person.**" *Id.* Similarly, in *Rosenblatt,* the court determined that it would be illogical to interpret the language of § 519 to hold the actor strictly liable for harm to the actor's own property in those cases in which, at some time thereafter, the property changed hands. 642 A.2d at 188. **Furthermore, imposing strict liability on Texaco for the plaintiffs' losses, like imposing a duty of care in negligence, would violate the rule of caveat emptor in real estate transactions....**

*Jones,* 945 F.Supp. at 1051 (Underlined emphasis original, bold emphasis added.) Compare: *Smith Land & Improvement Corporation v. Celotex,* 851 F.2d 86, 90 (3d Cir.1988) ("[U]nder CERCLA, the doctrine of caveat emptor is not a defense to liability for contribution but may only be considered in mitigation of amount due.")

That was also the holding of the District Court for the Eastern District of Missouri in *Cross Oil,* 944 F.Supp. at 790. Basing its holding on a prior unpublished decision, *Local No. 682 Health and Welfare Trust Fund v. Whiting,* No. 91–1575–C–7, 1992 WL 799413 (E.D.Mo. May 19, 1992), the court looked to the language of section 519 and the common law origins of strict liability principles. Quoting from *Local No. 682,* the court stated in *Cross Oil:*

> [The section 519(1) doctrine of liability for abnormally dangerous activity] ... was originally set forth in *Rylands v. Fletcher,* L.R. 1 Ex. 265 (1866). *Rylands* held that if a person brings something on his land which, if it escapes, is likely to do harm, that person is *prima facie* liable for all the damage naturally occurring if there is an escape. *Id.* at 279.

*Cross Oil,* 944 F.Supp. at 790. In rejecting the application of strict liability, the court was influenced by Missouri's narrow construction of strict liability and to the decision of the United States District Court for the District of Massachusetts in *Wellesley Hills Realty Trust.*

In *Wellesley,* the court refused to extend liability for abnormally dangerous activities to subsequent owners, finding such liability inconsistent with the focus in Section 519 and in *Rylands* on harm to the property of *another.* The court found that it would be "nonsensical to even formulate a rule that an actor is strictly liable for harm inflicted on his or her own property or person." *Wellesley,* 747 F.Supp. at 102. See also: *325–343 E. 56th Street Corp. v. Mobil Oil Corp.,* 906 F.Supp. 669, 677–78 (D.D.C.1995); *55 Motor Ave. Co. v. Liberty Indus. Finishing Corp.,* 885 F.Supp. 410, 423 (E.D.N.Y.1994); *Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.,* 640 A.2d 950, 955 (R.I.1994); and *Futura Realty v. Lone Star Bldg. Centers,* 578 So.2d 363 (Fla.App. 3 Dist.1991), *review denied,* 591 So.2d 181 (Fla.1991).

Of the jurisdictions reviewed, New Jersey and Maine appear to be alone, or at least among a very few jurisdictions, in recognizing a cause of action in strict liability assertable by subsequent owners. Its willingness to expand section 519 liability to include such claims is grounded in social policy. The New Jersey courts determined that the party who conducts an abnormally dangerous activity on his land, not his successor-in-title, should bear the risk of harm that activity causes.

However, the courts rejecting application of the doctrine looked to the language of section 519 and to its origins in English

common law. That analysis is, we are persuaded, the proper one. It is plain from the language of section 519 and the common law principles from which it derives that it was not intended to extend to successors-in-title. On that basis, we decline to extend it to the claims asserted here.

We will, therefore, grant the motion to dismiss Count VII on the grounds that it is time-barred and that there is no cause of action in strict liability under the facts alleged.

### Count IX—Private nuisance

■ Count IX of the amended complaint asserts a claim for private nuisance. Under Virginia law, a private nuisance is an activity "which unreasonably interferes with the use and enjoyment of" the property of another. *City of Newport News v. Hertzler*, 216 Va. 587, 221 S.E.2d 146, 150 (1976).

Other courts have "consistently rejected" claims brought by the current owner against the former owner of the premises for environmental contamination. *Hanlin Group, Inc. v. International Minerals & Chemical Corporation*, 759 F.Supp. 925, 935 (D.Me. 1990) (collecting cases). See also: *Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303, 313–15 (3d Cir.1985) (applying Pennsylvania law); *Cross Oil Company v. Phillips Petroleum Company*, 944 F.Supp. 787, 792 (E.D.Mo.1996); and *The Chase Manhattan Bank, N.A. v. T & N plc*, 905 F.Supp. 107, 125 (S.D.N.Y.1995).

■ We reach the same conclusion here. By the definition of the cause of action under Virginia law, a claim exists only for "unreasonable interference" with the use and enjoyment of the property of another. Here, when the cause of action arose, i.e. when the alleged contaminants were deposited by activities of Beazer or a predecessor corporation, it owned the land. Therefore, no tort was committed against the land of another.

We will, therefore, grant the motion to dismiss Count X on the grounds that it is time-barred and that there is no cause of action for private nuisance under the facts alleged.

### Count X—Public nuisance

■ Andritz' claim for a public nuisance, asserted in Count X, fails on the merits as well. Under Virginia law, as under the law of most states, a "cause of action for public nuisance is based on a claim of injury resulting from a condition which is dangerous to the public." *Chapman v. City of Virginia Beach*, 252 Va. 186, 475 S.E.2d 798, 802 (1996), citing *Taylor v. City of Charlottesville*, 240 Va. 367, 397 S.E.2d 832, 835 (1990).

■ A private nuisance consists of conduct which is the legal cause of an invasion of the interest in the private use and enjoyment of land of another if that invasion is 1) intentional and unreasonable, 2) negligent or reckless, or 3) actionable under the rules governing liability for abnormally dangerous conditions or activities. *Nashua Corporation v. Norton Company*, 1997 WL 204904 at *4(N.D.N.Y. April 15, 1997) (applying New York law). See also: *Restatement (Second) of* Torts, § 821C(1).

By definition, the duty owed and the ensuing harm are contemporaneous. Consistent with that interpretation, private nuisance law has, historically, been utilized as a "means of resolving conflicts between neighboring contemporaneous land users." *Id.*, quoting *55 Motor Ave. Co. v. Liberty Indus. Finishing Corp.*, 885 F.Supp. 410, 421 (E.D.N.Y.1994).

Only with the advent of environmental contamination litigation have there been attempts to utilize it as a means of imposing liability in favor of the current landowner on a prior landowner for contaminants left on or placed in the property. Most courts have rejected such attempts as inconsistent with the underpinnings of a cause of action for public nuisance. Cf. *Chase Manhattan Bank*, 905 F.Supp. at 125–26 and *Westwood Pharmaceuticals, Inc. v. Nat'l Fuel Gas Distrib. Corp.*, 737 F.Supp. 1272, 1281–82 (W.D.N.Y.1990).

■ Although there appears to be no Virginia appellate case law directly on point, we are convinced that if the issue came before the Supreme Court of Virginia, it would reject utilization of a cause of action for public nuisance as a vehicle for the recovery of environmental cleanup costs by the current owner as inconsistent with the basic principles of the tort. *Id.* (collecting cases)

In *Truck Components, Inc. v. K–H Corporation*, 1995 WL 692541 at * 12 (N.D.Ill. Nov. 22, 1995), the court rejected a public nuisance claim brought against a previous owner, stating:

> ... it is difficult to see material difference between a public and a private nuisance in the context of a subsequent private landowner seeking to sue the previous owner for contamination of the property. While a public nuisance might be actionable against the prior owner if brought on behalf of the public, the present property owner cannot avoid the limitation against bringing a private nuisance action by merely converting his claim to one of public nuisance.

*Id.* See also: *Philadelphia Electric*, 762 F.2d at 316 (Plaintiff lacked standing to sue for public nuisance because it "has suffered no 'particular damage' in the exercise of a right common to the general public")

We will, therefore, grant the motion to dismiss Count XI on the grounds that it is time-barred and that there is no cause of action for public nuisance under the facts alleged.

### Count XI—Trespass

■ The basis for an action in "trespass" at common law is the direct physical interference with the person or property of another. Like the other tort claim asserted by Andritz, trespass has historically been defined as arising out of current, not former, ownership of a property. A claim arises when the defendant trespasses on the property of another. *Cross Oil*, 944 F.Supp. at 793 (applying Missouri law). That did not occur here. Andritz had no property interest in the land when the allegedly tortious acts, i.e. the disposal of hazardous substances, were committed. Its ownership of the property was not contemporaneous with the tortious acts upon which it bases its claim of trespass.

■ Like other courts confronted with this issue, we see no justification for altering the traditional definition of the tort of trespass to impose liability on a former owner of the premises. See, e.g. *Cross Oil*, 944 F.Supp. 787 and *Dartron Corp. v. Uniroyal Chemical Co., Inc.*, 893 F.Supp. 730, 741 (N.D.Ohio 1995) ("A cause of action for trespass does not contemplate a vendee suing a land vendor for the vendor's past conduct on the land.")

We will, therefore, grant the motion to dismiss Count XI on the grounds that it is time-barred and because there is no cause of action for trespass under the facts alleged.

### Count XII—Claim for contribution

■ Count XII asserts a claim for contribution under VA.Code Ann. § 8.01–034. Andritz contends that the Commonwealth could have asserted a claim against Beazer as well as Andritz under Va.Code Ann. §§ 62.144–34:18(c) and 62.1–44.34:20, and that by proceeding with the cleanup directed by VDEQ, Andritz is discharging a common obligation, rendering Beazer liable for its share.

Beazer asserts that no such right of recovery exists, because Andritz has not alleged, and the facts do not establish, that any third party has a cause of action against both Andritz and Beazer. We disagree. VDEQ could have proceeded against Beazer as well as Andritz under VA.Code Ann. § 62.1–44.34:18(C) and 62.1–44.34:18(C). Thus, by assessing the damage and proceeding with remedial measures, Andritz is discharging a joint obligation, for which Beazer may be assessed its share of the costs.

The cases Beazer relies upon are distinguishable. In *City of North Miami v. Berger*, 828 F.Supp. 401, 414 (E.D.Va.1993), "no underlying tort or other cognizable state law claim ... [was] asserted so as to give rise to a claim for contribution under state law." That is not the case here.

In *Matter of Reading*, 900 F.Supp. 738 (E.D.Pa.1995), the other case Beazer relies upon, the court observed in a footnote, without analysis that:

> CERCLA's own contribution provision controls any potential Third–Party Plaintiffs' recovery against Reading because a contrary result under state law could potentially frustrate federal policy. See *United States v. Union Gas Co.*, 743 F.Supp. 1144, 1155 (E.D.Pa.1990). Thus, third party plaintiffs' claims for restitution

and common law contribution are preempted by CERCLA and cannot be pursued. *Id.* at 744 n. 6.

We are not persuaded that the view that CERCLA preempts a state—law based claim for contribution is either the majority view or the correct interpretation of CERCLA. Other courts have held that, while if CERCLA is invoked to recover costs paid out against another potentially responsible party, the action is properly brought under section 113,[10] not section 107,[11] of CERCLA, state law claims remain an option as well. See generally: *General Electric Company v. Buzby. Bros. Materials Corp.,* 1996 WL 608488 (D.N.J. June 20, 1996).

Whatever options are invoked, Andritz is not entitled to a double recovery of the same costs. This much is made clear in section 114 of CERCLA. CERCLA section 114, 42 U.S.C. § 9614(b), reenforces the impression that Congress did not intend actions brought under section 107 or 113 of CERCLA to preempt state-law based remedies to recover cleanup costs.

Section 114 of CERCLA provides that:

> Any person who receives compensation for removal costs or damages or claims pursuant to this chapter shall be precluded from recovering compensation for the same removal costs or damages or claims pursuant to any other State or Federal Law. Any person who receives compensation for removal costs or damages or claims pursuant to any other Federal or State law shall be precluded from receiving compensation for the same removal costs or damages or claims as provided in this chapter.

*Id.*

■ We agree that to the extent that there is an actual conflict between CERCLA and state law, federal law preempts the conflicting state law. *Manor Care, Inc. v. Yaskin,* 1991 WL 10016 (D.N.J.) at *1, citing *Meyer v. International Playtex, Inc.,* 724 F.Supp. 288, 290 (D.N.J.1988). Thus, only to the extent that the remedies available to Andritz under Virginia statutory law conflict with recovery available under CERCLA is the former would be preempted. In any such cases of actual conflict, the CERCLA provision controls. There is not, however, we are persuaded, blanket preemption of such claims.

The motion to dismiss Count XII will,'therefore, be denied.

### Count XIII

Count XII asserts a common law claim for contribution. Citing *Carickhoff v. Badger–Northland, Inc.,* 562 F.Supp. 160, 163 n. 2 (W.D.Va.1983), Beazer argues that such relief is unavailable because there is no claim for contribution under Virginia common law. Although that was the general rule in Virginia prior to the General Assembly's codification of a statutory right of contribution in 1919, the rule was not without exceptions.

■ One such exception applies to situations in which a party "is only a technical wrongdoer, and did not actually participate in the wrongful act." That party, upon "being compelled to pay damages to injured party, is entitled to contribution or indemnity from the actual wrongdoer." *Glover v. Johns–Manville Corp.,* 525 F.Supp. 894, 903 (E.D.Va.1979), citing *McLaughlin v. Siegel,* 166 Va. 374, 185 S.E. 873, 874 (1936). " 'The inquiry is always: whether the difference in the gravity of the faults of the participants is so great as to throw the whole loss upon one.' " *Id.,* quoting *United States v. Savage Truck Line,* 209 F.2d 442, 447 (4th Cir.1953), *cert. denied,* 347 U.S. 952, 74 S.Ct. 677, 98 L.Ed. 1098 (1954). Here, the relative degree of fault between Andritz and Beazer is a factual question which remains to be determined. It is clear, however, that Andritz is not foreclosed as a matter of law from asserting a claim for contribution under Virginia common law.

Beazer further asserts that claims for contribution under common law are preempted by CERCLA under the district court's holding in *Reading Co.,* 900 F.Supp. at 744 n. 6, a contention we have already rejected in our discussion of the motion to dismiss Count XII.

For these reasons, we will deny the motion to dismiss Count XIII.

---

**10.** 42 U.S.C. § 9613.

**11.** 42 U.S.C. § 9607.

## Count XIV

In Count XIV Andritz asserts a claim for restitution on the basis that it has been compelled to pay out monies for harm caused by the actions of Beazer. Beazer moves to dismiss Count XII on the grounds that the law does not permit such recovery, and because an entity which confers a benefit on another incidentally to performing a legal obligation of its own cannot recover on a theory of restitution, *Ciba–Geigy Corp. v. Sandoz Ltd.*, 1993 WL 668325 at *8–9 (D.N.J. June 17, 1993).

 A plaintiff seeking restitution under common law for unjust, enrichment must demonstrate: 1) enrichment to another; and 2) which will result in an injustice if recovery is denied. *S C Holdings, Inc. v. A.A.A. Realty Co.*, 935 F.Supp. 1354, 1372 (D.N.J. 1996) (applying New Jersey law), citing *Ciba–Geigy*, 1993 WL 668325 at *8–9. "Restitution of a benefit conferred is not available if that benefit is the result of performing one's own duty."

The *Restatement of Restitution*, § 106 (1937) provides that:

[A] person who, incidentally to the performance of his own duty or to the protection or the improvement of his own things, has conferred a benefit upon another, is not thereby entitled to contribution.

*Id.*

 Here, Andritz has a legally enforceable obligation under CERCLA and the Virginia environmental statutes to cleanup contamination at the Crewe site and has, in fact, been ordered to do so by VDEQ. In cleaning up the site it is, therefore, fulfilling its own legal obligation, not that of another. Therefore, it has no right to recover against Beazer on a theory of restitution for unjust enrichment. See, e.g., *SC Holdings*, 935 F.Supp. at 1372; *Mayor and Council of the Borough of Rockaway v. Klockner & Klockner*, 811 F.Supp. 1039, 1058 (D.N.J.1993); and *Ciba–Geigy*, 1993 WL 668325 at *8–9.

We will, therefore, grant the motion to dismiss Count XIV.

## Count XV

Count XV asserts a claim for declaratory judgment under 28 U.S.C. §§ 2201 and 2202 on the grounds that Beazer, as the alleged "corporate" and "legal" successor in interest to Sprout Waldron should be liable for any and all responsibility of Sprout Waldron for all remedial costs incurred by Andritz.

Beazer moves to dismiss on the grounds that the claim asserted in Count XV is derivative of those asserted in other counts challenged as subject to dismissal. Our denial, in part, of the motion to dismiss requires that we deny the motion to dismiss Count XV as well, since there remain in the action counts upon which it may be based.

The motion to dismiss Count XV will, therefore, be denied.

### Motion to compel by Bridon

Bridon moves to compel Andritz to comply fully with Fed.R.Civ.P. 34 in responding to its requests for production of documents and for the imposition of sanctions pursuant to Fed.R.Civ.P. 37. Bridon objects not to the failure to provide responsive documents, but rather to the manner in which Andritz responded to its document requests.

Most of the documents which are the subject of Bridon's document requests relate to Plant No. 2 at Muncy, the only property with which Bridon has had any contact. Bridon estimates that less than ten percent of the documents it seeks to obtain relate to Plant No. 1 at Muncy. None of them pertains to the Crewe site.

Andritz has turned over to Bridon documents responsive to its request, but has refused to give any assurance that all responsive documents have been produced. What it has done instead is to inform Bridon that if it wants the assurance that it has all responsive documents in existence, it must search through an estimated 130,000 pages of documents stored at the offices of Andritz' counsel in Washington, D.C. relating to operations and cleanup of both Muncy properties and the Crewe site.

Bridon attempted to review the documents, but found the task of separating responsive from non-responsive material daunting. Its preliminary review of 130,000 pages of documents revealed that: 1) the documents are not placed in file folders, identified with labels or organized by any discernable system; 2) individual documents are not sta-

pled together or fastened with paper clips; .3) all that separates individual documents from each other are colored sheets of paper. Due to the lack of organization, no systemized retrieval of relevant documents is possible. The only way Bridon could be assured that it has all documents responsive to its specific requests would be to review each page of every document for any mention of Plant No. 2 at Muncy. Bridon further states that most of the materials it would be required to review in this painstaking fashion relate not to Plant No. 2, but to the other properties.

 We agree that Andritz' response is unacceptable. It violates both the letter and the spirit of Rule 34(b), which requires any party producing documents for inspection to produce them either "as they are kept in the usual course of business" or to "organize and label them to correspond with the categories in the request." Fed.R.Civ.P. 34(b). See: *Obiajulu v. City of Rochester,* 166 F.R.D. 293 (W.D.N.Y.1996). Andritz has done neither.

Andritz did not present the documents to Bridon in the manner in which they were kept in the ordinary course of business. They are in no discernable order. Nor are they labeled or grouped in such a way that Bridon can ascertain without an extraordinary expenditure of time and money which of the 130,000 individual pages pertain to issues relevant to the claims against it.

Andritz' refusal to certify the completeness of its responses and production of a mass of unlabeled material is an inappropriate attempt on its part to shift its obligation to provide Bridon with all documents responsive to its document requests. The burden is Andritz,' not Bridon's.

Andritz' response is particularly inappropriate in the context of this case. As Bridon correctly points out, Andritz favored the consolidation of the separate actions filed to recover costs incurred at Pennsylvania and Virginia sites. The court recognized when the motion for consolidation was granted and continues to recognize that the consolidation has made Bridon's ability to defend itself in some respects more burdensome. Although there were at the time, and remain, legiti-

mate reasons for consolidating the cases, the burdens consolidation imposes on Bridon should not be made any more irksome than necessary. There is no justification for requiring it to sort painstakingly through thousands and thousands of pages to retrieve a relatively small amount of information relating to the claims against it and its defenses.

Nor should Bridon be penalized because of its relative disadvantage in not being a party to prior litigation between Beazer and Andritz. Beazer and Andritz have the "advantage" of being able to draw upon documents and testimony produced in connection with prior litigation and arbitration between them to which Bridon was not a party. Thus, while abbreviated responses may be appropriate between the two of them because of their background in litigating prior, similar or related claims, it is not in the case of Bridon, which is a party only to this action.

Andritz will, for all of these reasons, be required to: 1) produce any additional documents responsive to Bridon's outstanding document requests and certify that to the best of its knowledge and information, the documents produced represent all records responsive to Bridon's requests; [12] *or* 2) organize the records made available to Bridon in a coherent and logical manner such that the records Bridon seeks are readily retrievable; *or* 3) make available to Bridon the records in the order and manner compiled in the ordinary course of business. Andritz will have forty-five days from the date of this memorandum and the accompanying order to complete its response. We decline to impose sanctions at this time. If Andritz does not comply with the accompanying order within the time period allotted, we will revisit the question of sanctions.

**Motion to compel by Beazer and counter-motion by Andritz for a protective order**

Beazer moves to compel the production of documents and testimony Andritz has refused to divulge on grounds of relevancy and privilege. Most of the documents which Beazer seeks were generated by, or in con-

---

12. Bridon speculates that the manner in which the documents are presented suggests that they have been scanned into a database. If that is the

case, it should be relatively easy for Andritz to isolate those documents pertaining exclusively or in part to Muncy Plant No. 2.

nection with consulting work performed by EnSafe, Envirogen and ENSR Consulting (ENSR), environmental consultants retained by Andritz and its predecessor corporation, Combustion Engineering (CE).[13] Beazer seeks to reopen the depositions of James Downing, Jeffrey Bower and David Bumstead,[14] and others to pursue avenues of inquiry foreclosed by Andritz.

Andritz has filed a counter-motion seeking a protective order pursuant to Fed.R.Civ.P. 26(c) barring disclosure of the information Beazer seeks. Andritz asserts that the documents and testimony Beazer seeks to compel are not relevant to any issues in this case and are, in addition, exempt from compelled disclosure on grounds of privilege. Andritz invokes the attorney client privilege, the common interest doctrine, the work product doctrine and the self-critical analysis privilege as bases for barring disclosure.

### Relevancy

█ The scope of discovery is broad under the federal rules of civil procedure. Under Fed.R.Civ.P. 26(b)(1), "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." Once an objection has been raised on relevancy grounds, the party seeking discovery must demonstrate that the request is within the scope of Fed.R.Civ.P. 26(b). " 'Once this showing has been made, the responding party has the burden of showing some sufficient reason why discovery should not be allowed.' " *Robbins v. Camden City Board of Education*, 105 F.R.D. 49 (D.N.J.1985), quoting Shepard's, *Discovery Proceedings in Federal Court*, § 7.17 at 441 (2d ed.1991) and *Nestle Foods Corp. v. Aetna Casualty and Surety Co.*, 135 F.R.D. 101, 104 (D.N.J.1990).

Beazer seeks to compel the disclosure of documents it hypothesizes may reveal that Andritz' selection of remedial alternatives was based, in part, on business and economic considerations calculated to make the property marketable more quickly. Only those

costs incurred consistent with the National Contingency Plan (NCP) are recoverable under CERCLA.[15]

Regulation 300.430(e)(9)(iii) lists nine criteria against which remedial alternatives under consideration should be weighed:

1. Overall protection of human health and the environment;

2. Compliance with applicable or relevant and appropriate requirements (ARARs);

3. Long-term effectiveness and permanence;

4. Reduction of toxicity, mobility or volume through treatment;

5. Short-term effectiveness;

6. Implementability;

7. Cost;

8. State Acceptance; and

9. Community acceptance.

40 C.F.R. § 300.430(e)(9)(iii)(A)—(I).

█ Real estate marketing considerations are not among the factors listed as proper for consideration. 40 C.F.R. §§ 300.430 and 300.700. To the extent that such considerations influenced Andritz' selection of remedial measures, the selection process may have been improper, a flaw which could conceivably diminish or defeat Andritz' right to recover certain costs. Cf. *Hatco Corp. v. W.R. Grace & Co.*, 849 F.Supp. 931, 963–64 (D.N.J.1994) and *BCW Associates, Ltd. v. Occidental Chemical Corp.*, 1988 WL 102641 at * 17 (E.D.Pa. Sept. 1988). The relationship between the information Beazer seeks and the analysis EPA regulations required Andritz to employ in selecting among remedial alternatives brings it within the scope of Rule 26(b). If not relevant in and of itself, it may lead to relevant evidence.

---

**13.** ENSR was retained by CE to advise it on environmental matters and oversee investigation and remediation of the Muncy and Crewe sites.

**14.** Bumstead is in-house counsel for Andritz.

**15.** Andritz is not required to prove compliance with federal NCP regulations to recover costs

under the Pennsylvania Hazardous Sites Cleanup Act (PaHSCA), 35 Pa.Code §§ 6020.507, 6020.701, and 6020.702. *Bethlehem Iron Works, Inc. v. Lewis Industries, Inc.*, 1996 WL 557592 at *63–66 (E.D.Pa. Sept. 19, 1996).

### Privileges asserted

Whether the information is protected as privileged is a separate issue. The burden of establishing that a privilege applies is on Andritz, the party invoking it. *Colorado v. Schmidt–Tiago Constr. Co.,* 108 F.R.D. 731, 734 (D.Colo.1985) Whether the privilege applies is a question of law for the court to decide. Privileges in general are not expansively construed, because they necessarily impinge on the production of relevant evidence. *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

In a federal question case with supplemental state law claims, the federal law of privileges governs the entire case. *Wm. T. Thompson Co. v. General Nutrition Corp., Inc.,* 671 F.2d 100, 104 (3d Cir.1982). Federal Rule of Evidence 501 provides:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, **the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.** However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Fed.R.Evid. 501 (Emphasis supplied.)

In deriving the principles of federal common law which apply under Rule 501, the federal courts typically look to the state privilege law and follow its lead unless there is a strong federal policy to the contrary. Mia Anna Mazza, *The New Evidentiary Privilege for Environmental Audit Reports: Making the Worst of a Bad Situation,* 23 Ecology L.Q. '79, 98 (1996).

### Attorney client privilege

Under the federal common law of attorney client privilege, the party invoking it must prove: 1) the asserted holder of the privilege is or sought to become a client; 2) the person to whom the communication was made a) is a member of the bar of a court, or his subordinate and b) in connection with the communication is acting as a lawyer; 3) the communication relates to a fact of which the attorney was informed a) by his client b) without the presence of strangers c) for the purpose of securing primarily either i) an opinion on law or ii) legal services or iii) assistance in some legal proceeding, and not d) for the purpose of committing a crime or tort; and 4) the privilege has been a) claimed and b) not waived by the client. *Hercules, Inc. v. Exxon Corp.,* 434 F.Supp. 136, 144 (D.Del.1977). The privilege applies to communications from the attorney to the client, as well as to the reverse. *Westinghouse v. Republic of the Philippines,* 951 F.2d 1414, 1423 (3d Cir.1991).

The privilege may be waived by the communication of privileged information to outside parties, *U.S. v. Rockwell International,* 897 F.2d 1255, 1265 (3d Cir.1990), or by placing advice given by counsel at issue. Disclosure to agents retained by counsel to assist him or her in advising the client and handling legal matters does not operate as a waiver. The privilege attaches to agents and representatives of counsel whose services are necessary for effective representation of the client's interests. *X Corp. v. Doe,* 805 F.Supp. 1298 (E.D.Va.1992).

The privilege attaches to the communication itself, not to the facts communicated. Facts gathered by counsel in the course of investigating a claim or preparing for trial are not privileged and must be divulged if requested in the course of proper discovery. *Upjohn Co. v. United States,* 449 U.S. 383, 395–96, 101 S.Ct. 677, 685–86, 66 L.Ed.2d 584 (1981) and *United Coal Companies v. Powell Construction Co.,* 839 F.2d 958, 965 (3d Cir.1988) (applying Pennsylvania law). Opposing counsel is entitled to obtain through discovery the names of witnesses, facts underlying the cause of action, technical data, the results of studies, investigations and testing to be used at trial, and other factual information. *Protective National Insurance Company of Omaha v. Commonwealth Insurance Company,* 137 F.R.D. 267, 281 and 284 (D.Neb.1989). The inclusion of such information in documents prepared by, or circulated to, counsel does not render them inviolate on grounds of privilege.

■ What are protected in most instances, however, are the communications themselves. Documents sent to or prepared by counsel incorporating such information for the purpose of obtaining or giving legal advice, planning trial strategy, etc. are protected from compelled disclosure. To the extent that purely factual material can be extracted from privileged documents without divulging privileged communications, such information is obtainable.

■ Only communications made for the express purpose of obtaining or giving legal advice are protected. The contents of the communication determine whether the privilege applies. What would otherwise be routine, non-privileged communications between corporate officers or employees transacting the general business of the company do not attain privileged status solely because in-house or outside counsel is "copied in" on correspondence or memoranda. *United States Postal Service v. Phelps Dodge Refining Corp.*, 852 F.Supp. 156, 163–64 (E.D.N.Y. 1994).

■ Communications between corporate counsel and company personnel are privileged so long as the information is relayed for the purpose of obtaining legal counsel. *Upjohn*, 449 U.S. at 394–95, 101 S.Ct. at 685. The communications retain their privileged status if the information is relayed to other employees of officers of the corporation on a need to know basis. Only when the communications are relayed to those who do not need the information to carry out their work or make effective decisions on the part of the company is the privilege lost. *In re Grand Jury*, 758 F.Supp. 1411 (D.Colo.1991).

■ The privilege attaches only if the attorney is acting in the role of legal advisor. Issues as to what role the attorney was fulfilling arise most frequently in cases involving in-house counsel who may perform a number of functions for the corporation, only some of which place them in the role of legal advisor. Communications made by in-house counsel functioning in the role of business advisor or corporate administrator are not privileged.

■ Drafts of documents prepared by counsel or circulated to counsel for comments on legal issues are considered privileged if they were prepared or circulated for the purpose of giving or obtaining legal advice and contain information or comments not included in the final version. *Allegheny Ludlum Corp. v. Nippon Steel Corp.*, 1991 WL 61144 at *5 (E.D.Pa. Apr. 15, 1991). "Preliminary drafts of contracts are generally protected by attorney client privilege, since '[they] may reflect not only client confidences, but also legal advice and opinions of attorneys, all of which is protected by the attorney client privilege.'" *Muller v. Walt Disney Productions*, 871 F.Supp. 678, 682 (S.D.N.Y.1994), quoting *Schenet v. Anderson*, 678 F.Supp. 1280, 1284 (E.D.Mich.1988). See also: *Upsher–Smith Laboratories, Inc. v. Mylan Laboratories, Inc.*, 944 F.Supp. 1411, 1444–45. Compare: *United States Postal Service v. Phelps Dodge Refining Corp.*, 852 F.Supp. 156, 163 (E.D.N.Y.1994).

### Work-product doctrine

■ Attorney work product, i.e. documents prepared by counsel, or at counsel's direction, in preparation for trial or in anticipation of litigation, are not discoverable absent a showing of substantial need, undue hardship, or inability to obtain their substantial equivalent by other means. Recognized initially by the United States Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 393–94, 91 L.Ed. 451 (1947), the doctrine is now codified at Rule 26(b)(3), which provides:

(3) **Trial Preparation: Materials.** Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) **only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.** In ordering discovery of such materials when the required showing has been made, the court

shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Fed.R.Civ.P. 26(b)(3) (Emphasis supplied.) Counsel's mental impressions, and trial strategy enjoy nearly absolute protection from disclosure under Fed.R.Civ.P. 26(b)(3). *Protective National*, 137 F.R.D. at 280.

▮ Parties are obliged to reveal to their opponents facts learned in preparing for trial. The names of witnesses, the existence or non-existence of certain documents, etc. are discoverable. *Id.* at 278–281. What may not be obtained, however, are the written materials prepared by counsel or at the direction of counsel, such as interview notes, correspondence, memoranda to the file or to the client or consultants on legal strategy, questions of law etc., prepared "with an eye toward litigation." *Bogosian v. Gulf Oil Corp.*, 738 F.2d 587, 592 (3d Cir.1984).

▮ In the context of environmental claims, factual reports and compilations, such as the documentation of activities by experts or consultants carried out for the purpose of preparing a waste management or remedial plan to be submitted to federal or state regulatory authorities, tables compiled from testing done to determine the contaminants present at the site, proposed methods of remediation, or summaries of meetings, communications, or telephone conversations between state or federal regulatory authorities and expert consultants, or between the alleged violator and the authorities, are not protected from disclosure as work product. *In re Grand Jury Matter*, 147 F.R.D. 82 (E.D.Pa.1992).

### Common interest doctrine

▮ Andritz also invokes the common interest doctrine, an extension of the attorney client privilege and the work product doctrine, which applies only if the prerequisites for one of those privileges have been met. *Griffith v. Davis*, 161 F.R.D. 687, 691 (C.D.Cal.1995).

▮ The common defense doctrine "basically expands application of the attorney

client privilege or the work-product doctrine to circumstances in which it otherwise might not apply." *Id.* at 692. It protects communications between an individual and an attorney who represents someone else, if they form "part of an on-going and joint effort to set up a common defense strategy." *United States v. Bay State Ambulance and Hospital Rental Service, Inc.*, 874 F.2d 20 (1st Cir. 1989). To establish a right to the privilege, the party asserting it must show that: (1) the communications were made in the course of a joint defense effort, (2) the statements were designed to further the effort, and (3) the privilege has not been waived. *Id.* at 28, citing *In re Bevill, Bresler & Schulman Asset Management Corp.*, 805 F.2d 120, 126 (3d Cir.1986).

The doctrine essentially qualifies the requirement that a communication be made in confidence, and prevents waiver of the privilege to the extent that confidential communications are shared between parties with a common interest. The doctrine allows parties and counsel linked in a common defense effort to disclose privileged information to each other without losing the privilege. *Bay State*, 874 F.2d at 28. However, only those communications which form part of an "ongoing and joint effort to set up a common defense strategy" are protected. *Eisenberg v. Gagnon*, 766 F.2d 770, 787 (3d Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985).

▮ The interests of the parties need not be identical, and may even be adverse in some respects. *Griffith*, 161 F.R.D. at 693. "It is only when the clients' interests are completely adverse that the privilege will be denied." *Id.*, citing *Eisenberg*, 766 F.2d at 788 and Weinstein's Evidence ¶ 503(b) [06] at 503–100–01.

### Self-critical analysis privilege

The privilege of self-critical analysis, also known as the self-evaluative privilege, was first recognized in the context of hospital peer review comments on the care and treatment of patients, *Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249 (D.D.C.1970), *aff'd without opin.*, 479 F.2d 920 (1973).[16] Both

---

16. The privilege against compelled disclosure of

medical peer review reports has been codified in

federal and state courts have resisted efforts to expand it to include analyses performed in other contexts. See, e.g., *University of Pennsylvania v. EEOC,* 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) (United States Supreme Court rejected common law self-evaluative privilege in a Title VII case, citing among other reasons, the absence of any constitutional or common law basis for such a privilege). The privilege "remains largely undefined and has not generally been recognized." *Mazza, supra,* at 103.[17]

Only a few courts have held documents produced in the course of an environmental investigation or remedial action protected by such a common law privilege. See, e.g., *Reichhold Chemicals, Inc. v. Textron, Inc.,* 157 F.R.D. 522, 524 (N.D.Fla.1994). There is no authority before us which suggests that Pennsylvania or Virginia has adopted the self critical analysis test. We are not persuaded that either would follow the limited number of jurisdictions which have recognized such a privilege.

We will, therefore, disregard, in ruling on Andritz' claims of privilege, any claims based on an asserted privilege of self-critical analysis.

**Materials at issue**

Andritz is not taking the position that any and all materials reviewed by counsel or prepared by its environmental consultants are protected. It represents that it has in fact produced most materials relating to site remediation, and has excluded from production only a limited number of materials which are clearly privileged. All such materials have been listed in a privilege log provided to Beazer.

Both Andritz and CE retained outside counsel to provide legal advice on and oversee legal aspects of the remediation. Andritz retained the firm of Reed, Smith, Shaw & McClay. CE retained Winthrop, Stimson, Roberts & Putman as outside environmental counsel.

CE had a contractual right to "review and comment on all documents, plans, and reports prior to submission, if any, to the appropriate governmental authorities" pursuant to section 6.14(c) of the 1990 Stock Purchase Agreement.

Among the materials produced by Andritz are: 1) all final reports prepared by EnSafe relating to the investigation and cleanup of the Muncy site; 2) all preliminary investigative reports, site assessments, site characterizations, remedial investigations, feasibility studies, analyses of alternatives, risk analysis documents, and 3) the underlying technical data and analyses upon which the reports are based.

Excluded from production on claims of privilege were the following items, as to which Andritz' claims of privilege are disposed of as indicated:

■ 1) Drafts of required reports to state regulators circulated among the environmental consultants and attorneys for comment and review are protected under the attorney client privilege *if* the drafts contain comments or notations of counsel for Andritz and contain information or provisions not included in the final version;

■ 2) Documents provided by Ensafe, Envirogen or other environmental consultants to in-house or outside counsel for Andritz for the specific purpose of explaining or interpreting technical data so as to allow counsel to provide legal advice to Andritz in connection with, among other things, responding to demands and requests of the state or federal environmental regulators are protected under the attorney client privilege;

■ 3) Documents provided by ENSR or other environmental consultants to in-house or outside counsel for CE for the specific purpose of explaining or interpreting technical data so as to allow counsel to provide legal advice to CE in connection with, *inter*

---

most states. *Sanderson v. Frank S. Bryan, M.D., Ltd.,* 361 Pa.Super. 491, 522 A.2d 1138 n. 3 (1987) *app. denied,* 517 Pa. 624, 538 A.2d 877 (1988) and by the federal government, 42 U.S.C. § 11137(b)(1).

17. Four states, Oregon, Colorado, Kentucky and Indiana, have adopted a related statutory privi-

lege barring the disclosure of environmental audit reports. Mazza, *supra,* at 90 and 112. See also: John Davidson, *Privileges for Environmental Audits: Is Mum really the word?,* 4 S.C. Envtl. L.J. 111 (Fall 1995). That privilege has not been adopted by Pennsylvania, Virginia, or the federal government.

*alia,* responding to demands or requests from state or federal regulators, are protected under the attorney client privilege;

▋ 4) Documents generated between CE and Andritz in the course of exercise by CE of its contractual right to review and comment on "all documents, plans and reports" prior to their submission to regulatory authorities are protected under the common interest doctrine if the documents were generated by or sent to counsel for the purpose of obtaining legal advice *or* related to trial tactics, legal strategy, etc. and were generated in anticipation of litigation;

▋ 5) Documents circulated among, by and between Andritz, in-house counsel David Bumstead and outside environmental counsel, Reed, Smith, Shaw & McClay for the purpose of obtaining or giving legal advice are protected by the attorney client privilege *so long as* they were not circulated to other individuals outside this circle who did not have a need to know what decisions were made or provide input and so long as Bumstead was acting solely in the role of legal advisor in receiving or generating such documents—If and to the extent that counsel was not acting in the role of legal advisor, that is if and to the extent that certain documents were circulated to his attention based on his role as an officer or administrator or business advisor to the corporation—the privilege was waived and the documents are subject to disclosure;

▋ 6) Documents circulated among, by and between CE, its in-house counsel, John Brett and outside environmental counsel, Winthrop Stinson for the purpose of obtaining or giving legal advice—Such documents are protected by the attorney client privilege *so long as* they were not circulated to other individuals outside this circle who did not have a need to know what decisions were made or provide input and so long as Brett was acting solely in the role of legal advisor in receiving or generating such documents— To the extent that he was not acting in the role of legal advisor, that is if and to the extent that certain documents were circulated to his attention based on his role as an officer or administrator or business advisor to the corporation—the privilege was waived and the documents are subject to disclosure;

▋ 7) Communications among Andritz employees with in-house or outside environmental counsel copied in—Such documents are not privileged if counsel was copied in as a matter of course. Only if the express purpose of the communication was to relay information for the purpose of seeking legal advice does the privilege attach;

▋ 8) Communications among CE employees with in-house or outside environmental counsel copied in—Such documents are not privileged if counsel was copied in as a matter of course. Only if the express purpose of the communication was to relay information for the purpose of seeking legal advice does the privilege attach; and

▋ 9) Communications between CE officers or employees and Andritz officers or employees with in-house or outside environmental counsel copied in—Such documents are not privileged if counsel was copied in as a matter of course. Only if the purpose of the communication was to relay information for the purpose of seeking legal advice does attorney client privilege attach—The same documents are protected by the common interest doctrine only if the information relayed related to matters of joint concerning in prosecuting claims against Beazer and Bridon.

\*　　\*　　\*

An order will be entered consistent with this memorandum.

### ORDER

For the reasons stated in the accompanying memorandum, **IT IS ORDERED THAT:**

1. Beazer's motion to dismiss Andritz' amended complaint (record document no. 54(b)) is granted as to Counts III, VI, VII, VIII, IX, X, XI and XIV. The motion is otherwise denied.

2. Bridon's motion to compel (record document no. 93) is granted, in the manner and to the extent provided on pages 44 to 45 of the accompanying memorandum.

3. Beazer's motion to compel (record document no. 111) is granted, subject to the restrictions imposed on pages 58 to 61 of the accompanying memorandum.

4. Andritz' motion for issuance of a protective order (record document no. 122) is granted to the extent of the restrictions imposed on pages 58 to 61 of the accompanying memorandum.